**Thornton ELLIOTT, et al.,**
**Plaintiffs–Appellants,**

v.

**The UNITED CENTER, A Joint Venture f/k/a Metro–Chicago Sports Stadium Joint Venture, Defendant–Appellee.**

No. 96–3002.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1997.

Decided Oct. 3, 1997.

Mark Weinberg (argued), Chicago, IL, Donald G. Weiland, Chicago, IL, for Plaintiffs–Appellants.

Howard A. Voeks (argued), Richard A. DelGiudice, Gozdecki & DelGiudice, Chicago, IL, for Defendant–Appellee.

Before COFFEY, MANION, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Millions of spectators have attended games and other events at the United Center, home of the world-famous Chicago Bulls, as well as the Chicago Blackhawks, circuses, ice shows, concerts, and in 1996 the Democratic National Convention. But ever since the United Center opened, replacing the former Chicago Stadium, it has had a policy that prohibits all patrons of the Center from bringing food into the arena. This, according to Thornton Elliott and his co-plaintiffs, has given a "monopoly" on food sales to the Center. Elliott and his colleagues are licensed peanut vendors who, up until the time the United Center imposed this policy, turned a respectable profit selling peanuts outside the stadium. (For ease of reference, we refer to all plaintiffs collectively as "Elliott" below.) They brought this suit under section 2 of the Sherman Act, 15 U.S.C. § 2, claiming that the United Center's food policy constitutes an illegal attempt to monopolize food sales inside the arena and in the surrounding geographic area. The district court was unpersuaded and dismissed the case under Fed. R.Civ.P. 12(b)(6). We agree. "Food sales within the United Center" does not describe a relevant market that is subject to § 2 strictures, and the allegations fall far short of establishing that the presence of the United Center threatens all other food purveyors in any meaningful geographic area.

According to the complaint, ever since the United Center implemented its food policy in September 1994, patrons are inspected for food when they enter the stadium, and if any is found, it is confiscated by stadium security. If a fan buys a bag of peanuts from Elliott, therefore, she must consume it before she enters the United Center, unless she wants to risk contributing it to the "illegal food" stash collected by the security personnel. Worse yet, if she has a hankering for peanuts during the Bulls game, her desires will go unfulfilled, because the United Center does not offer peanuts for sale in the stadium (except little bags of peanuts for the circus elephants). This policy has cost Elliott dearly. The complaint (filed on September 22, 1995), alleged that "last year" (*i.e.* 1994, we assume, although it does not distinguish between the time before and the time after the United Center opened) their sales were over $500,000. Under the new policy, the average sales of peanuts have dropped to approximately one-fifth of sales in previous years. Predictably, some vendors have gone out of business, and the remaining ones are struggling to survive.

The complaint alleged that the relevant market was the one for "food concessions at the United Center." (Complaint, ¶ 21.) Because peanuts are the only food sold directly outside the United Center to United Center patrons, it further alleged that the plaintiffs were the only competitors to the United Center itself in this relevant market. It conceded that the United Center might have had a legitimate business reason to prohibit certain kinds of food, such as cans, bottles, or alcoholic beverages in general, in the interest of maintaining order in the facility, but it claimed that no such reason could be advanced for the blanket food ban. The complaint points out the United Center's monopoly over the presentation of live National Basketball Association games and live National Hockey League games in the Chicago market, and implicitly argues that the Center is, through the food policy, attempting to extend its monopoly to the alleged food concession market.

The district court, as we noted above, concluded that these allegations were insufficient to state a claim under the Sherman Act.

*Elliott v. United Center,* 1996 WL 400030, at *3 (N.D.Ill. July 15, 1996). In so doing, it followed a recommendation from Magistrate Judge Rebecca R. Pallmeyer to deny the preliminary injunction Elliott had requested, in which she too had concluded that the vendors could not succeed on the merits of their claim. Magistrate Judge Pallmeyer had accepted the plaintiffs' standing to sue, but she found that they had not shown antitrust injury, within the meaning of *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), nor had they defined a proper relevant market. The district court agreed, with specific attention to the relevant market finding. Without a relevant market to back it up, virtually all of the remaining antitrust theories collapsed. The court's order of dismissal also dismissed Elliott's state law claims for interference with business and prospective advantage (raised under the court's supplemental jurisdiction), for two reasons: first, it declined to exercise supplemental jurisdiction since the federal claims had been dismissed so soon, and second, it found that the complaint did not state a claim of intentional tortious interference under Illinois law. (This makes it somewhat unclear whether the dismissal of the state law claims was with or without prejudice. The first reason would suggest it was without prejudice, see *CarnegieMellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Wright v. Associated Ins. Cos., Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994), while the second would normally imply it was with prejudice, see *Paganis v. Blonstein,* 3 F.3d 1067, 1071 (7th Cir.1993) ("[U]nless the judgment provides otherwise, involuntary dismissal, including a dismissal for failure to state a claim under Rule 12(b)(6), is an adjudication on the merits—in other words, a dismissal with prejudice."); *LeBeau v. Taco Bell, Inc.,* 892 F.2d 605, 608 (7th Cir.1989).)

We need go no further in this matter than the market analysis on which both Magistrate Judge Pallmeyer and District Judge James Holderman relied. In order to prevail under § 2 of the Sherman Act, the plaintiffs would need to show "(1) the possession of monopoly power in the relevant mar-

ket and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Only the relevant market concerns us here. As Judge Easterbrook wrote for this court in *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250 (7th Cir.1995), "a market is defined to aid in identifying any ability to raise price by curtailing output." *Id.* at 1252. In what market, then, does the United Center have this kind of power? Elliott replies, the market for food concessions within and around the United Center itself: the fewer the food concessions, the higher the price the United Center can charge for food its patrons consume, and the more consumers will suffer.

But people do not go to the United Center to buy food; they go to watch a basketball game, a hockey game, or some other special event. The United Center can recoup the cost of putting on the event in any of a number of ways. It can charge very high ticket prices, and allow unlimited numbers of food concessions in and around the stadium, or it can charge somewhat lower ticket prices and restrict the number of concessions (thereby earning some of its profits from the food sales). No one argues that the United Center is monopolizing the market for snack food in near west Chicago, because such an argument would be ludicrous on its face. The United Center is obviously not monopolizing the market for peanuts: it is staying strictly out of the peanut business. True, its ban means that those with a craving for peanuts must satisfy it either before or after the game, but both price and output of peanuts in any geographic area that would be meaningful under the antitrust laws (at least Chicago, we presume) are totally unaffected by the United Center's policies.

The logic of Elliott's argument would mean that exclusive restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be "monopolizing" the sale of wine within its interior. Movie theaters, which traditionally (and notoriously) earn a substantial portion of their revenue from the sales of candies, popcorn, and soda, would be required by the antitrust laws to allow patrons to bring their own food. The fact that there is more than one exclusive restaurant, and more than one movie theater, does not distinguish these examples from the case before us, although we anticipate that Elliott would argue that it does. For Elliott's principal point is that the customer knows that once he is ready to walk through the entry gate, he may not have with him any "outside" food. The same can be said of any of the establishments we have just mentioned: once inside a restaurant, or a movie theater, the customer is at the mercy of the place he has chosen. The price of the refreshments or the wine is just one part of the price of the evening out. Elliott suggests that the United Center under this theory could also "monopolize" the parking lots around it, which we suppose is true. (It is, in fact, what the Disney Corporation elected to do when it built Disney World in Orlando, Florida, having learned its lesson about losing economic rents from Disneyland in Anaheim, California. See Molnar, *A Tale of 2 Disneys*, Seattle Times, May 19, 1991.) He also suggests that the United Center could refuse admittance to any customer not wearing an NBA jersey purchased within the Center; again, perhaps this is theoretically true, although successful businesses normally do not try to shoot themselves in the foot so vigorously.

The serious point here is that the United Center is certainly a popular facility in Chicago. It serves, over the course of a year, millions of customers, and it is undoubtedly a prime spot for vendors of all kinds to ply their wares. But this implies that the relevant market should be expanded to all other comparable places in the Chicago area. Absent collusion, even if each stadium or arena had a policy similar to the United Center's policy, there would be no violation of the antitrust laws. In such an expanded market, furthermore, it is very doubtful that the United Center has any significant market power. And we have explicitly rejected the proposition that a firm can be said to have monopoly power in its own product, absent proof that the product itself has no economic substitutes. See *Digital Equip. Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756, 761 (7th Cir.1996); see also *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 160–61 (7th Cir. 1972).

We therefore conclude that the district court correctly dismissed Elliott's complaint for failure to state a claim. The judgment below is AFFIRMED.