**HAMILTON CHAPTER OF ALPHA DELTA PHI, INC., Alumni Association of Psi Chapter of Psi Upsilon, Inc., Beta of Sigma Phi Society, Inc., and Delta Kappa Epsilon Society of Hamilton College, Plaintiffs,**

v.

**HAMILTON COLLEGE and Eugene M. Tobin, President of Hamilton College, Defendants.**

**No. 95–CV–926.**

United States District Court, N.D. New York.

June 29, 2000.

Steele, Silcox & Browning, PC, Clark R. Silcox, of counsel, Washington, DC, for plaintiffs.

Costello Cooney & Fearon, Syracuse, NY, for plaintiffs.

Hallenbeck, Lascell, Norris & Heller, LLP, Rochester, NY (David M. Lascell, of counsel), for defendants.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### INTRODUCTION

Plaintiffs, four fraternity associations connected with Hamilton College ("Hamilton"), brought this action against Hamilton and its president, Eugene M. Tobin, challenging Hamilton's residential policy requiring all students to live in college housing and participate in a college meal plan. Plaintiffs contend that, as a result of this policy, Hamilton has a monopoly in the market for residential services in Clinton, New York, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. After the Second Circuit Court of Appeals reversed her dismissal of the complaint and remanded the matter, *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997), Hon. Rosemary S. Pooler, then a District Court Judge, bifurcated the case, directing the parties first to address the issue of market share. After discovery, defendants move for summary judgment on this issue.

### BACKGROUND

Hamilton, a small private liberal arts college in Clinton, New York, provides college-owned housing and college-sponsored meal plans to most of its students. For many years, Hamilton permitted some students to room and board in fraternities or other private housing. In spring 1995, Hamilton announced that, effective September 1995, all students were required to live in college-owned housing and purchase college-sponsored meal plans.

On July 10, 1995, plaintiffs brought this action pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging that Hamilton's residential policy violates section 2 of the Sherman Act. Plaintiffs seek damages, injunctive relief and attorney's fees.

Upon filing the complaint, plaintiffs moved for a preliminary injunction prohibiting the implementation of the residential policy. Defendants moved to dismiss the complaint on the ground that the provision of room and board to Hamilton students is not "trade or commerce" within the meaning of section 2 of the Sherman Act. Defendants submitted affidavits and documentary evidence to the effect that the purpose of the plan was not commercial but rather to create an academic environment that is more appealing to female applicants to Hamilton.[1] Defendants also argued that Hamilton's conduct had an insufficient nexus with interstate commerce to fall within the boundaries of the Sherman Act.

In a written decision dated April 12, 1996, Judge Pooler granted the defendants' motion to dismiss, holding that the Court lacked subject matter jurisdiction. Specifically, she held that the allegations in the complaint did not demonstrate that the provision of residential services under the challenged residential policy was "trade or commerce" and thus subject to the prohibitions of the Sherman Act. Judge Pooler further held that the complaint failed to establish the requisite nexus between Hamilton's conduct and interstate commerce. The Court did not reach the issues of the relevant product market and Hamilton's market power.

The Second Circuit reversed, holding that the question of whether Hamilton's

---

1. According to the Chairman of the Board of Trustees, "fewer than 20% of the current students, self-selected [fraternity] males who have inherited these [fraternity houses,] virtually control social life on [Hamilton's campus]. Women students tell us time and again that, while they are fond of Hamilton, they do not feel they have the same social and residential opportunities as their male classmates. They do not enjoy—and cannot afford to replicate—the privileges of fraternity life. More disturbing is evidence that this disparity is leading many of the most talented prospective female applicants to seek education elsewhere.... The most disturbing result, however, has been increasing evidence that Hamilton is in danger of being perceived more for its social life than for its academic rigor...."

conduct was "trade or commerce" was not a question of subject matter jurisdiction but rather a question affecting the merits of plaintiffs' claim. *See Hamilton Chapter*, 128 F.3d at 65. The Second Circuit further held that District Court's determination that Hamilton's conduct was not "trade or commerce" as a matter of law was erroneous and that plaintiffs had adequately alleged a nexus with interstate commerce.[2] *Id.* at 67.

Thereafter, Judge Pooler wrote to the parties on December 23, 1997, stating in part:

Definition of the relevant product and geographic markets is an element of plaintiffs' cause of action which must be plead and proved. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Although market definition is generally a question of fact, the issue can be decided as a matter of law. *Purgess v. Sharrock*, 1992 WL 349683, at *5 (S.D.N.Y.); *see also Ally Gargano/MCA Advertising Ltd. v. Cooke Properties, Inc.* 1989 WL 126066, at * 16 (S.D.N.Y.) (granting summary judgment in section 1 case).

In this case, there appear to exist serious questions as to whether plaintiffs have adequately plead the relevant product and geographic markets in the first instance. In light of these questions regarding this critical element of plaintiffs' case, I conclude that discovery in this case will be bifurcated, with the initial phase limited to the threshold issue of market definition. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 133 F.R.D. 41 (D.Nev.1990) (because all antitrust plaintiffs must establish relevant markets and the existence of entry bar-

riers, initial discovery restricted to these topics).

## FACTS

Briefly, the undisputed material facts are as follows. Hamilton enrolls approximately 1650 college students each academic year. In 1993–1995, Hamilton operated 18 dormitories with a capacity of approximately 1450 beds housing 1342–1425 college students in a given semester. The expense of residential services has always been a separate charge from tuition. Until September 1995, residential services were provided to Hamilton students by a number of fraternities and private landlords in the Clinton, New York area, as well as by Hamilton. Thereafter, all students have been required to live in college-owned facilities and to purchase college-sponsored meal plans. Students who matriculate at Hamilton agree to abide by Hamilton's rules, and, since September 1995, Hamilton's rules determine where students will live and how much they will pay for residential services.

Hamilton competes with a large number of select colleges to enroll high school seniors as freshmen. In 1990, the Hamilton College Board of Trustees ("Board") identified equity, educational quality, and competitiveness in admissions as three areas requiring review. In 1992, the Board began a review of residential life on campus. For eighteen months, beginning in 1992, two committees gathered information on residential life at Hamilton and at least sixteen peer institutions.[3] The Board noted, *inter alia*, that several peer institutions had made changes in their residential life programs. Some required students to live in college owned housing; others abolished fraternities and sororities altogether. In

---

**2.** The Second Circuit cautioned: "It may be that further proceedings will demonstrate that defendants' conduct in fact involves no substantial effect on interstate commerce, or even if it does, involves no violation of the Sherman Act. We hold only that the allegations are sufficient, and express no view on the merits."

**3.** These peer institutions include Amherst College, Bowdoin College, Colby College, Colgate University, Dickinson College, Denison University, Grinnell College, Gettysburg College, Kenyon College, Middlebury College, Princeton University, Rensselaer Polytechnic Institute, Trinity College, Union College, Wesleyan University and Williams College.

April 1994, the Board appointed a Committee on Residential Life, the stated objectives of which were to ensure greater integration of academic and residential life to promote Hamilton's educational mission, provide equality of social and residential opportunity for all students, and offer all students a rich variety of on-campus activities which encourage student involvement in campus life. The committee's report contained four recommendations designed to improve the academic and competitive standing of Hamilton. Relevant to this case are the following two recommendations:

1. Hamilton is a residential college. All students will live in College housing, and all residential spaces will be available to all students.

2. Dining, an integral part of the residential experience, provides an opportunity to build community, connect in-class and out-of-class activities, and enhance student satisfaction. All Hamilton students will participate in one of the College meal plans in accordance with rules established by the College.

The Board endorsed the committee's report and implemented its recommendations. On March 3, 1995, Hamilton announced that, effective September 1995, all students would be required to live in college-owned facilities and purchase college-sponsored meal plans.

Although the reasons for the changes are sharply disputed, it is undisputed that since 1995, the following changes have occurred at Hamilton: the number of applications for admission to Hamilton has increased; the average SAT scores of applicants has improved; the number of female applicants has increased, as well as the number and percentages of females admitted and enrolled; the percentage of applicants accepted has declined; and Hamilton's ranking in the U.S. News rankings of top liberal arts colleges has improved. The Court does not view the reasons for the changes as material to resolution of the motion herein.

### EXPERT PROOF

In support of their motion, defendants rely on the affidavit of their expert, Jerry A. Hausman, Ph.D, an economics professor at Massachusetts Institute of Technology. Hausman concludes that the relevant product market consists of over one hundred highly select colleges with which Hamilton competes.[4] He points out that high school seniors typically apply to between six and ten colleges, which he views as evidence of a high degree of substitution or cross-elasticity among a large number of colleges. Further, highly select colleges compete with each other to enroll the "best" students, such as those with high SAT scores and grade point averages, students with special talents and students who add diversity. Hamilton enrolls only about 30 percent of the students it admits. Moreover, highly select colleges charge very similar fees for tuition, room and board. Hausman states that if Hamilton were to raise its charges above competitive levels, it would lose students to other colleges. Based on these economic factors, Hausman concludes that Hamilton and the other highly select colleges are competing in the same market, the market for highly competitive colleges. Hausman concludes that Hamilton does not possess market power in that market; it is only one of a number of colleges with comparable attributes.

Plaintiffs' expert, William O. Kerr, Ph. D., an economic consultant and Executive Vice President of PENTA Advisory Services, LLC, submits a report and an affi-

---

4. Hamilton's documents show that its closest competitors include, among others, Colgate, Skidmore, Union, SUNY Geneseo, Vassar, the University of Rochester, Cornell, Franklin and Marshall, Lafayette, Gettysburg, Dickinson, Trinity, Wesleyan, Connecticut College, Middlebury, the University of Vermont, Williams, Amherst, Tufts, Boston College, Bates, Bowdoin, and Colby.

davit. He agrees that Hamilton does not possess market power in the national market for college education, but contends that that is not the proper market. Kerr defines a market as a function of the interaction of supply and demand, given any constraints that may exist from market imperfections or outside forces. According to Kerr, the relevant market here is the market for residential services in and around Clinton, New York. The demand side is composed of Hamilton students, whose specialized needs for particular types of housing, food and meeting space are distinct from those of other consumers in the geographic area. The supply side is served by specialized facilities whose characteristics suit the relatively distinctive needs of the students. Until 1995, private landlords and fraternities were among the suppliers of residential services to the students, and sororities were potential or, at times, actual competitors in this market. The products and services offered by competitors in this market are interchangeable, though not identical.

Kerr states that, prior to enrolling at Hamilton, applicants possess incomplete information regarding "the effective quality-adjusted price of room, board, and residential services at Hamilton," that is, they are not aware of factors such as overcrowding which reduce the quality of the facilities provided by the college. He further states that, after completing their first year at Hamilton, students have a substantial investment in continuing to attend Hamilton and typically would not transfer to other colleges as a result of an increase in housing cost or a decrease in housing quality. Kerr does not dispute Hausman's statement that all highly select colleges charge very similar fees for tuition, room and board; rather, he avers that accurate information concerning financial aid, the real determining factor in college costs, is unavailable. Hamilton has gained a significant financial reward from the 1995 policy requiring all students to live and dine in college-owned facilities.

Kerr concludes that there is a distinct market for the sale of residential services to Hamilton students, that Hamilton enjoys market power,[5] that prior to the 1995 change in policy the students enjoyed the benefits of competition in the market, and that "the foreclosure of this competition can only harm consumers."

## THE MOTION

The issue before the Court as framed by Judge Pooler in her letter of December 23, 1997, is the validity of plaintiffs' definition of the relevant product market as "the market for residential services for students matriculating at Hamilton College." Defendants urge that plaintiffs' definition is incorrect and that the market is "the market in which Hamilton College competes: the market for highly select colleges."

## APPLICABLE LAW

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "Informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See id.* at

---

**5.** Given the Court's determination on the issue of relevant market, the Court does not address the question of Hamilton's market share; therefore the Court does not set forth the proof submitted on this issue.

322, 106 S.Ct. 2548. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In ruling on a motion for summary judgment, a court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides: "Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize *any part of the trade or commerce* among the several States, or with foreign nations, shall be deemed guilty of a felony…" (emphasis added). The phrase, "any part of the trade or commerce" as used in section 2 has been interpreted by the Courts to refer to the "relevant market" which the defendant is monopolizing or attempting to monopolize. 2 Von Kalinowski, Antitrust Laws and Trade Regulation, 24.01[2] (2d ed.).

■ To state a monopolization claim under section 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). It is "a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979). This is so because "[w]ithout a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

■ Plaintiffs have the burden of defining the relevant product market. *See Hack v. President and Fellows of Yale College*, 16 F.Supp.2d 183, 196 (D.Conn. 1998). When identifying the relevant market, plaintiffs must include all reasonably interchangeable or substitutable products. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991). A market must comprise "not [the] commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir.1997), *cert. denied*, 523 U.S. 1059, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Allen–Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 206 (3d Cir.1994).

Reasonable interchangeability is also indicated by "cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As the Third Circuit explained in *Tunis Bros.*, 952 F.2d at 722, "products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." Defining a relevant product market is "a process of describing those groups of producers which, because of the similarity of their products, have the

ability—actual or potential—to take significant amounts of business away from each other." *Hayden Pub. Co., Inc. v. Cox Broad. Corp.,* 730 F.2d 64, 71 (2d Cir.1984) (internal quotation marks and citation omitted).

## DISCUSSION

The facts material to determination of defendants' motion are undisputed. In considering the application of the law to these facts, the Court is mindful that it must resolve all ambiguities and draw all reasonable inferences in favor of plaintiffs.

■ Plaintiffs herein define the relevant market as "the market for residential services for students matriculating at Hamilton College." It is undisputed, however, that a number of colleges with which Hamilton competes to enroll high school graduates provide functionally similar educational offerings and have the potential to take significant numbers of students away from Hamilton. Hausman's affidavit and undisputed documents in the file demonstrate that, in selecting a college, prospective students consider a cluster of services necessarily offered by nearly every college, such as academic services, health services, financial aid and residential services, as well as qualities such as size and location. Students do not—indeed cannot—shop separately for individual college services or characteristics, but rather must select one college which offers a group of services and qualities. *See generally United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 356, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (holding that in context of commercial banking services, relevant market comprised banks offering cluster of products and services; consumers generally shop for group of banking services, not individual services), *accord Grinnell,* 384 U.S. at 572, 86 S.Ct. 1698. Prospective students

who do not find Hamilton's housing policy attractive are free to choose to attend a different college. *See Lee v. Life Ins. Co. of N.A.,* 23 F.3d 14, 17–19 (1st Cir.1994); *Hack,* 16 F.Supp.2d at 197; *accord Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 345–347 (N.D.Ill.1997). Plaintiffs' proposed market definition, which is too narrow to take into account the ability of prospective students to choose to enroll elsewhere, fails to include all reasonably interchangeable or substitutable products.

Stated another way, plaintiffs, in fashioning their market definition, have failed to take into account cross-elasticity of demand between the product and substitutes for it, that is, that the rise in the price of a good within a relevant market would tend to create a greater demand for other like goods in that market. *See Tunis Bros.,* 952 F.2d at 722. Defendants urge, with support in the record, that Hamilton and the other highly select colleges with which it competes charge very similar fees for tuition, room and board. They further urge that if Hamilton were to inflate the cost of residential housing significantly, the cost of attending Hamilton would rise, prompting prospective students to select other similar colleges offering a more reasonably priced educational package. Plaintiffs and their expert Kerr do not directly contend otherwise.[6] Rather, they argue that the actual cost of attending the comparable colleges cannot be ascertained because Hausman, defendants' expert, admittedly was unable fully to account for the impact of financial aid offered by the colleges. There is no evidence, however, that financial aid, for which some students do not qualify and which may include not only grants but loans, which must be repaid, and work-study awards, which must be earned, is so influential as to negate the

---

**6.** Although plaintiffs submit evidence that, after completing their first year at Hamilton, students have a substantial financial incentive to remain there to complete their college education, the Court does not consider this a relevant factor in defining the relevant market. Hamilton announced its new residential policy in Spring 1995. Since that time, all prospective students have been able to consider Hamilton's residential policy and its economic impact in deciding which college to attend.

significance of room and board costs in enrollment decisions. Plaintiffs have not raised a question of fact with respect to defendants' showing that cross-elasticity of demand among highly select colleges is a factor in delineating the applicable market.[7]

Kerr further opines, with the support of student affidavits, that, after completing their first year at Hamilton, students have a substantial investment in continuing to attend Hamilton, such that they would not transfer to other colleges as a result of an increase in housing costs or a decrease in housing quality. The Court agrees with defendants that, even if true, this assertion is not material. Hamilton announced its new residential policy in Spring 1995; thereafter, all prospective students have been able to consider Hamilton's policy in deciding which college to attend. Any housing constraints experienced by students who have chosen to enroll despite the residential policy flow from their implied contract with Hamilton to comply with its rules, including the residential policy. The economic forces pertinent to the definition of a relevant market for antitrust purposes must flow from the market, not from private contract; therefore, a contractual restraint assumed by a particular class of consumers is not a proper basis for a market delineation. *See Queen City Pizza,* 124 F.3d at 438.

Plaintiffs' definition of the relevant market as "the market for residential services for students matriculating at Hamilton College" fails to take into account the cross-elasticity of demand among Hamilton and its competitor colleges. By defining the market in terms of a single class of consumers, i.e., "all students enrolled at Hamilton," plaintiffs create an artificially narrow market which is defined essentially in terms of the practice of which they complain. *See Redmond v. Missouri W. State College,* 1988–2 Trade Cas. 68,323, 1988 WL 142119 (W.D.Mo.1988); *accord Elliott v. United Ctr.,* 126 F.3d 1003, 1005 (7th Cir.1997).[8] Moreover, delineation of the relevant market in this case must be based on forces arising from the market, not from contract. Defendants have demonstrated that the relevant market in this case must be sufficiently broad to encompass all colleges which are "reasonably interchangeable" with Hamilton and that, therefore, plaintiffs' proposed market definition is incorrect as a matter of law. Plaintiffs have not proven otherwise, nor have they raised a triable question concerning a material fact. Plaintiffs do not assert—nor, on this record, could the Court find—that, if their proposed market definition is rejected, they may still have a viable claim based on a different market definition which is broad enough to encompass all reasonably interchangeable colleges.

## CONCLUSION

Accordingly, despite drawing all reasonable inferences in favor of plaintiffs, the

7. Kerr also avers that Hamilton has effectively raised the cost of residential housing by reducing the quality of the housing provided for the same amount of money, and has the power to continue to do so, without affecting enrollment. The record is, however, devoid of evidence that the quality or value of housing for the "student dollar" at Hamilton is less than that offered by other highly select colleges so as to eliminate cross-elasticity of demand among highly select colleges as a factor in delineating the applicable market. Nor have plaintiffs created a question of fact regarding defendants' proof of cross-elasticity of demand.

8. In addressing a similarly restrictive market definition, the Court in *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 346, n. 22, (N.D.Ill.1997) stated:

[T]his argument is like a consumer going to McDonald's and complaining that the only hamburgers available for purchase are those prepared by McDonald's. This is perfectly true, at McDonald's. But any consumer who is not content with a McDonald's hamburger may leave and choose from a myriad of available alternatives. McDonald's refusal to sell Whoppers does not mean that it has monopolized a relevant market for hamburgers.

Court concludes that defendants have carried their burden on this motion of demonstrating that "there is no genuine issue as to any material fact and that [they are] ... entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

It is therefore

ORDERED that defendants' motion for summary judgment is granted; and it is further

ORDERED that the complaint is dismissed in its entirety.

IT IS ORDERED.