TYMKOVICH, Circuit Judge,
concurring.
JetAway has spun a sordid tale of small-town politics, but it has not described an injury the antitrust laws were designed to protect. And because JetAway cannot establish an antitrust injury, I join the per curium opinion that affirms the district court’s decision below. Beyond this general level, however, I part company with the reasoning Judge Holmes employs in his concurring opinion (“Holmes Concurrence”) to reach this conclusion. Indeed, given the analytical path down which the parties have guided the court—a path the Holmes Concurrence instinctively follows—I cannot underwrite some of the specifics of Judge Holmes’s analysis. Proceeding along a different path compelled by the law, even one not specifically advanced by the parties, is the only way to recognize the realities of the antitrust principles at play in this case.[1]
In particular, I disagree that this entire case is an instance of JetAway seeking to merely substitute one monopoly for another. Part of this case certainly falls under *856 that analysis, namely, the portion of the case relating to the County’s choice in 2005 to solicit bids for a private fixed-base operator. Whichever entity won the bid would assume the County’s role of operating the single on-airport FBO. Thus, whether the bid process was clean or corrupt, the before-and-after picture is the same: one on-airport FBO. That scenario does not benefit consumers of FBO services.
But the same reasoning does not apply to defendants’ post-bid efforts to prevent JetAway from becoming a second FBO. The relevant market is the Airport, and the Airport has no duty to allow competition for services on its premises. To avoid this conclusion, the defendants credit, and the Holmes Concurrence adopts, a .narrower definition of the market—“FBO services at the Airport.” And since the demand for FBO services would be insufficient to support two FBOs, the before- and-after picture will likely be the same: one on-airport FBO. Under this view, the competition for a natural monopoly is an “elimination bout” with the consumer an uninterested spectator. Thus, no antitrust injury.
Assuming the relevant market is a “natural monopoly,” I .still think competitive forces could play a pro-consumer role. Although Judge Holmes’s reasoning is appealing on its surface, its logic is actually a self-fulfilling prophecy. If demand in a certain market is so low that only one firm can survive, then whether the incumbent firm behaves as a monopolist depends entirely on the rule we adopt. If, as Judge Holmes reasons, the incumbent firm is insulated from antitrust liability because it got there first, then the incumbent will indeed' behave as a monopolist—because we said it can. But if, as I believe, the incumbent firm deserves no privileged position simply by virtue of already being there, then the very threat of an upstart entering the market will at least marginally constrain the incumbent’s ability to extract monopoly rents. That does benefit consumers. And in any event, we have no right to enshrine the incumbent in its monopoly position simply because it is already there. That choice belongs to consumers.
Thus, I cannot agree with the implications of the Holmes Concurrence; namely, that an upstart in a low-demand, one-firm market can never state an antitrust injury.[2] I believe this reasoning would establish a wrongful precedent, and is unnecessary in any event. Yes, JetAway fails to state an antitrust injury with respect to defendants’ post-bid efforts to prevent Jet-Away from becoming a second FBO, but for a much simpler reason: JetAway is actually seeking to join, the Airport’s monopoly over services on its premises. It is well established that seeking to join a monopoly does not benefit consumers, and therefore states no antitrust injury.
I therefore write separately to explain what I believe to be the correct reasoning.
I. Analysis
There are two complementary methods of demonstrating the failure of JetAway’s antitrust claims: “by reference to the proper definition of a market or by reference to the absence of anticompetitive conduct.” Christy Sports, LLC v. Deer Valley Resort Co., Ltd., 555 F.3d 1188, 1193 (10th *857 Cir.2009). I will discuss each in turn, beginning with market definition.
A. Market Definition
JetAway brings claims under both Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2). “To state a cause of action for conduct prohibited under § 2 of the Sherman Act, the plaintiff must define a relevant market within which the defendants allegedly engaged in anticompetitive behavior.” Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1117 (10th Cir.2008).
For purposes of summary judgment, the district court accepted JetAway’s expert’s definition of the market as “FBO services at the Airport.” Aplt.App. at 6865. The Holmes Concurrence also embraces this naiTowly defined market. See Holmes Concurrence at 20-21, 35. But in my view, this definition misapprehends the relevant airport market, and does not reflect the underlying economic reality at play.
“The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal....” Christy Sports, 555 F.3d at 1194. Thus, a ski resort may monopolize the market for ski rentals within the resort, id. at 1193-96; a hospital may monopolize the market for services within the hospital, Four Corners Nephrology Associates, P.C. v. Mercy Medical Center of Durango, 582 F.3d 1216, 1221-25 (10th Cir.2009); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 480 n. 5 (7th Cir.1988); and a stadium may monopolize the sale of food within the stadium, Elliott v. United Center, 126 F.3d 1003, 1004-05 (7th Cir.1997). This result flows from the fact that skiers do not go to ski resorts simply to rent skis, patients do not go to a hospital simply for a single service, and sports fans do not go to a stadium simply to eat food. See Elliott, 126 F.3d at 1005. Rather, they purchase a package of related services. “To define one small component of the overall product as the relevant product market is simply implausible.” Christy Sports, 555 F.3d at 1194.
The fact that a hospital, ski resort, or stadium might contract with a third party to provide a specific service does not change this:
[ 0]ne is hard-pressed to see any [antitrust] violation in an agreement between, say, Disneyland and McDonald’s, that gives McDonald’s the exclusive right to operate restaurants in the Disneyland park, even if the result is that McDonald’s charges higher food prices in the park than prevail outside. Disneyland could certainly choose to operate its own restaurant in its own park with exactly the same result, and the franchise agreement with McDonald’s would be simply an alternative way of capturing those rewards.
I Phillip E. Areeda et al., Antitrust Law ¶209e3, at 315 (3d ed. 2007) (‘Areeda”).
Although the Montrose Airport is no Disneyland, a materially identical situation prevails here. No one disputes that the Airport may control access to its own premises, nor that FBO services are among the many types of services airlines, pilots, and passengers enjoy when visiting the Airport’s premises. Thus, the Airport may operate its own FBO (as it has done in the past), it may operate its own FBO alongside a competitor (as it has also done in the past[3]), it may permit a single concessionaire to take over its FBO operations (as JCP has), and it may permit additional concessionaires to operate FBOs (as JetAway desires). As far as the anti *858 trust laws go, none of these scenarios presents a problem. See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (“The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage.”). Indeed, if this was a private airport, I suspect all parties would have recognized this from the outset. Cf. IA Areeda, ¶ 224e2, at 128 (“[A] private airport is ordinarily free under the antitrust laws to decide that a single FBO is sufficient”).
Of course, one might argue that the public nature of the Airport (recognizing the Montrose County Building Authority’s role) distinguishes it from a private business. Many of the cases expounding on the power of a business to restrict competition on its premises rely on the need to allow private firms to recoup their investment. See, e.g., Christy Sports, 555 F.3d at 1194; Elliott, 126 F.3d at 1005; see also Verizon Commc’ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (“[A]s a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.” (internal quotation marks omitted; alterations incorporated)). But this same need can apply to public entities as well as private. A public airport, just like a private airport, must somehow pay for the cost of building, maintaining, and perhaps upgrading its facilities, along with many other expenses. Thus, for example, a large airport like Denver International Airport might strictly control its concessionaires and the services they supply. But from an antitrust perspective, I see no reason to allow a private firm to choose with whom it will deal but not allow a public entity the same freedom.
An aspiring entrant into an airport’s “market” might question a public airport’s statutory authority to monopolize a market within its boundaries, to choose with whom it will deal, or to grant an exclusive concession.[4] But “the authority of the public [entity] to act restrictively [within its ‘business’] should be challenged in the customary manner for judicial review of administrative action that is unauthorized by or inconsistent with the relevant statutes governing those [entities].” I Areeda, ¶ 209e3, at 316. Indeed, JetAway has already brought such proceedings in state court and before the FAA. Aplt. Opening Br. at 16-21. But, again, these are not concerns to be enforced through federal antitrust laws. Cf. NYNEX, 525 U.S. at 137, 119 S.Ct. 493 (“[0]ther laws [besides the Sherman Act], for example, unfair competition laws, business tort laws, or regulatory laws, provide remedies for various competitive practices thought to be offensive to proper standards of business morality.”). In principle, this logic applies to private and public entities alike.
In sum, “FBO services at the Airport” is not a relevant market. Instead, the market includes the full cluster of interrelated services that the Airport offers. Without its narrowly constructed market definition, JetAway has no Sherman Act claim based on defendants’ efforts to thwart JetAway’s desire to establish an FBO at the Airport. As I see it, the Airport faced no antitrust *859 exposure for its decision to retain a single FBO.

B. Antitrust Injury

For similar reasons, JetAway has failed to allege a cognizable antitrust injury. “[A] plaintiff can recover [under the antitrust laws] only if [its] loss stems from a competition -reducing aspect or effect of the defendant’s behavior.” Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (emphasis in original). As the district court recognized, JetAway alleges two distinct anticompetitive injuries: (1) efforts allegedly to corrupt the bid process, and (2) efforts allegedly to maintain JCP as the exclusive FBO. Aplt.App. at 2645. Neither allegation satisfies the “competition-reducing” requirement.

1. The Bid Process

Before the County called for bids, it ran the Airport’s sole on-airport FBO. There had been no competition for over ten years. The County then ostensibly opened the bidding for the chance to assume the County’s FBO operations. JetAway claims that JCP’s connections to the County made the result of the bidding a foregone conclusion, and even insinuates that JCP had an opportunity to change its bid in response to JetAway’s.
The question, then, is whether a corrupt bid process reduces competition when the parties are bidding for an exclusive concession—or more specific to this case, when the parties are bidding to take over a portion of the monopolist’s business that the monopolist had been running itself. The answer is no. Even had the bid process been clean, the result is the substitution of one firm for another, leaving competition—or the lack thereof—unchanged. “[Substitution of one monopolist for another is not an antitrust violation.” FTC v. Phoebe Putney Health Sys., Inc., - U.S. -, 133 S.Ct. 1003, 1014, 185 L.Ed.2d 43 (2013) (quoting IA Areeda, ¶ 224e, at 126) (alteration in original).
With this much, I agree with Judge Holmes. The fact that JetAway had been operating a through-the-fence FBO does not change this. Even if we considered JetAway’s off-airport operations relevant to the preexisting state of competition, the result from the consumer’s standpoint is either the same or worse. When JetAway lost the bidding process, the status quo remained: one on-airport FBO and one off-airport FBO. Had JetAway won the bidding process, the consumer would have been left with a single FBO. Accordingly, JetAway cannot state a harm to competition with regard to the bid process at issue in this case, even if it was corrupt.

2. Post-Bid Efforts to Prevent a Second FBO

JetAway’s other claim that defendants have conspired to exclude a second FBO likewise fails.
Again, no one disputes that the Airport may control its own premises. Thus, if the district court enjoined the Airport to allow JetAway to open an on-airport FBO, we would then have two on-airport FBOs, both operating under the Airport’s control. JetAway assumes that such an arrangement would lead to competition, but the Airport has no antitrust duty to allow competition on its premises. In that respect, the Airport is like the defendant hospital in our recent Four Comers Nephrology decision. A nephrologist, Dr. Bevan, had sued a hospital under the antitrust laws to force the hospital to give him staff privileges, allowing him to compete with the hospital’s in-house nephrology department. But, we said,
even if we were to force [the hospital] to accommodate Dr. Bevan’s demand, the *860 hospital could simply impose costs and conditions on Dr. Bevan’s activities that would prevent- him from undercutting the hospital’s own nephrology practice. Dr. Bevan very well might be better off with .such a shared monopoly, but there’s no guarantee consumers would be. Whatever injury he may have suffered, then, it is not one the antitrust laws protect.
Four Corners Nephrology, 582 F.3d at 1226; see also IIIB Areeda, ¶ 773, at 239 (“When the monopolist is forced to sell [to a competitor], it sets the monopoly price and overall competitiveness is not affected at all; we simply have two firms sharing the monopoly rather than one.”). In short, JetAway “is not a victim of antitrust injury, for there is no antitrust right to join a cartel.” IIA Areeda, ¶ 348el, at 217.[5]

3. The Holmes Concurrence’s Analysis

The foregoing analysis suffices to dispose of JetAway’s claim that defendants have conspired to exclude a second FBO. Judge Holmes, however, employs different reasoning in his concurrence. By merging JetAway’s claims related to the corruption of the bid process with its claims that defendants subsequently orchestrated to prevent JetAway from becoming a second FBO, -Judge Holmes relies exclusively on the substitution-of-monopolist rule to reject the latter claims. Because the circumstances underlying each claim are distinct, I believe the Holmes Concurrence underestimates the scope of its premise with respect to the injury alleged concerning the post-bid process.
Judge Holmes, like defendants, bases his conclusion regarding defendants’ post-bid exclusionary efforts largely on JetA-way’s expert, who opined that the relevant market was “FBO services at the Airport” and, in his view, “[t]here is only enough demand for FBO services at the Airport to support one FBO.” Aplt.App. at 3190. In estimating JetAway’s damages, the expert also assumed that competition between JCP and JetAway—if permitted—-would last only about a year, after which JetA-way would prevail. Aplt.App. at 4834, 4981, 6959. Defendants therefore argue: (1) the short period of competition JetA-way’s expert anticipates is not enough to state an antitrust injury, and (2) ultimately JetAway is seeking to substitute one monopolist for another. Defendants argue, in essence, that providing FBO services at the Montrose Airport is a natural monopoly. Cf Richard A. Posner, Economic Analysis of Law § 12. 1, at 460 (8th ed. 2011) (“[I]f a market is small enough, almost any kind of firm can have a natural monopoly—a grocery store in a village, for example—because every firm has some fixed costs, and they may dominate total costs if demand is low enough.”).
This reasoning goes down an anticom-petitive path. Defendants have cited no persuasive authority for the notion that a projected short period of competition (should the plaintiff prevail on its antitrust claim) somehow vitiates antitrust injury. Indeed, defendants’ cited authorities stand for the converse. In Adaptive Power Solutions, LLC v. Hughes Missile Systems Co., 141 F.3d 947 (9th Cir.1998) and Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243 (D.C.Cir.1987), courts found insufficient antitrust injury because the lack of competition lasted only a short time.[6] In other words, *861 competition existed, then disappeared for a short time, then reappeared. That is not this case. Here, competition has disappeared at the Airport, but would reappear if JetAway could win this lawsuit, and then might disappear about a year later.
The crucial problem with defendants’ argument is the failure to distinguish the significance of the Airport’s ownership of its premises from the significance of low demand. As explained previously, it is the Airport’s control over concessionaires that undermines JetAway’s claim of antitrust injury—concessionaires may only compete on the terms set by the coneession-gran-ter, which do not altogether coincide with the interests of the consumer. But defendants argue (and Judge Holmes agrees) that low demand (or the “natural monopoly”), regardless of the Airport’s control of its own premises, is enough to invoke the substitution-of-monopolist rule.
Assuming for sake of argument that a public airport has a duty to open its premises to freewheeling concessionaire competition, its failure to do so is—right now— reducing competition, which is the essence of antitrust injury. This is so even if the sought-for competition is inevitably a winner-take-all contest. “[C]ompetition for a natural monopoly can be just as beneficial to consumers as competition within an ordinary market.” Ill Areeda, ¶ 658b3, at 178 (emphasis in original). Among other things, the threat of potential competition for a natural monopoly will force the incumbent to lower its prices, knowing that upstarts may be waiting in the wings. Id. In any event, during the one-year competition period forecasted by JetAway’s expert, pilots and airlines could play one FBO against the other for the best long-term deals—futures contracts, essentially—thus preserving lower prices for a longer term than the competition period itself. And again, as long as the victor knows that an upstart could potentially invade its market, monopoly pricing power is constrained.[7]
I am not aware of any principle of antitrust law which can convert such competition-enhancing possibilities into a lack of antitrust injury. “If monopoly power can be used to beget monopoly, the [Sherman] Act becomes a feeble instrument indeed.” United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 763 n. 8, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Indeed, defendants *862 offer, and the Holmes Concurrence appears to accept, what is essentially the shoot-the-moon theory of antitrust law: as long as a firm succeeds in capturing a low-demand market, it may violate the Sherman Act in every way possible to acquire and maintain that position. Recognizing this decision’s potential to authorize an incumbent monopolist to use such exclusionary tactics to maintain its power within a “natural-monopoly” market, the Holmes Concurrence—primarily within a lengthy footnote—designates this issue an “open question.” See Holmes Concurrence at 27-28 n.12, 55. This question, says Judge Holmes, is to be left for another day. But the logic and rule of law espoused by the Holmes Concurrence inevitably answer this question by sanctioning the incumbent’s monopolistic behavior in any one-firm market. Judge Holmes and defendants reach this unfortunate conclusion by adopting the conclusion of JetAway’s expert, but the principle supporting the argument cannot be confined to this case. In subsequent eases, were the Holmes Concurrence to control, other defendants would hire their own experts to testify that demand can only support one firm—the obvious implication being that the incumbent defendant should remain enthroned because it happens to already be there.[8]
And in the antitrust realm, there is every difference in the world between a monopolist anointed by consumers and a monopolist anointed by itself. See Trinko, 540 U.S. at 407-08, 124 S.Ct. 872 (distinguishing those who obtain monopoly power through “superior product, business acumen, or historic accident” and those who obtain it through “anticompetitive conduct” (emphasis removed)); United States v. Aluminum Co. of America, 148 F.2d 416, 429 (2d Cir.1945) (“[T]he origin of a monopoly may be critical in determining its legality.”). Thus, the incumbent newspaper in a town too small to support more than one paper may not defend an antitrust suit by asserting that one paper or the other will inevitably fail: “Where there is no identity of performance we will not say that the public does not have an interest in competition even though that competition be an elimination bout.” Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582, 590 n. 4 (1st Cir.1960); see also Greenville Publ’g Co. v. Daily Reflector, Inc., 496 F.2d 391, 397 (4th Cir.1974) (“[E]ven if we proceeded on the assumption that one of the [competing papers] must fail, deliberate exclusionary conduct would still support a charge of attempted monopoly.... [T]he antitrust laws need not tolerate exclusionary conduct whenever it appears that only one competitor can survive the preliminary bout.”). Nor can the incumbent sports team in a town with only enough demand for one franchise avoid antitrust liability on that premise:
To hold otherwise could effectively mean that a defendant is entitled to remain free of competition unless the plaintiff can prove, not only that he would be a viable competitor, but also that he and defendant both would survive. This result would be ironic indeed: we cannot say that it is in the public interest to have the incumbent as ... its sole football team, merely because the incumbent got there first.
*863 Hecht v. Pro-Football, Inc., 570 F.2d 982, 991 (D.C.Cir.1977).
There is no good reason to treat airport FBO services differently. Assuming, again, that the Airport must open its premises to FBO competition, and that the Airport has only enough demand for one FBO, “[the] choice [between the upstart and the incumbent in a natural monopoly] should in the first instance be made by consumers.” Ill Areeda, ¶ 658b3, at 178. And JetAway in fact argues in this case that its now-shuttered through-the-fence FBO could provide better services to the consumer in the form of a more convenient location, larger hangar and terminal, more ramp space, and more fueling capacity. See Aplt. Opening Br. at 32-33.
To be sure, a defendant may offer evidence of low demand to support an argument that it operates in a natural monopoly—but this only rebuts any inference of illegality flowing from the defendant’s position as a monopolist. See Hecht, 570 F.2d at 990; Greenville Publ’g, 496 F.2d at 397. Nonetheless, “the fact that a market is a natural monopoly should not operate as a guarantee that a particular incumbent is entitled to be the natural monopolist; a more aggressive rival might be a more efficient occupant of the same position.” Ill Areeda, ¶658b3, at 177; cf. IIA Aree-da, ¶ 348, at 215 (“Even when a monopoly appears inevitable—which is seldom certain—antitrust does not become indifferent to the tactics employed by the victor. Thus, once pricing is determined to be predatory, the defendant would not escape liability to its immediate victim by asserting, or even proving, that monopoly is inevitable in this market.”).
Finally, defendants’ overarching substitution-of-monopoly argument depends entirely on assumptions about demand. But natural monopolies can evaporate as circumstances change, and demand is a circumstance that can fluctuate wildly. Prospectors in the Uncompahgre Valley could discover a new mineral deposit and Mont-rose could become a mining boomtown, leading to increased traffic at the Airport and enough demand for two or more FBOs. Cf. III Areeda, ¶ 658b3, at 177 (arguing against giving protected status to an incumbent natural monopolist because, among other, reasons, “technology may change a market from a natural monopoly to one in which rivalry is efficient” and any protected natural monopolist would have an incentive to stifle such innovation).
“[T]he ultimate issue is whether the plaintiff (1) seeks to join the exclusive arrangement while leaving the exclusivity requirement otherwise intact; or (2) seeks to forbid exclusivity, first on its own behalf, and implicitly on behalf of others.” IIA Areeda, ¶ 348el, at 217. JetAway sees itself under the second prong, and as between the second prong and the Holmes Concurrence’s substitution-of-monopoly argument, JetAway is closer to correct.
Unfortunately for JetAway, the closest to correct is actually the first prong. As noted, this case turns not on demand for FBO services at the Airport, but on the Airport’s control of its own premises. The Airport has no antitrust duty to open its premises up to concessionaire competition. If it did, however, then the demand-created natural monopoly would be no defense to antitrust liability.
II. Conclusion
For the reasons stated above, I would affirm the judgment of the district court.

. It is widely accepted, if not axiomatic, that a federal appellate court has discretion to affirm a grant of summary judgment on any legal grounds supported by the record. Signature Dev. Cos. v. Royal Ins. Co. of Am., 230 F.3d 1215, 1218 (10th Cir.2000). And while we lack a “carte blanche to depart from the principle of party presentation,” Wood v. Mil-yard, - U.S. -, 132 S.Ct. 1826, 1833, 182 L.Ed.2d 733 (2012), it is nonetheless appropriate to employ an alternative line of reasoning where the parties’ stipulation leads to a doctrinally unsustainable analysis. Cf. Arizona v. California, 530 U.S. 392, 412-13, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000).

. Judge Holmes constructively attempts to circumscribe the scope of his concurrence by acknowledging that his recommended "rule does not perforce safeguard the incumbent monopolist.” Holmes Concurrence at 60. While I certainly agree, that conclusion is significantly concealed by an approach, which, in so many ways, drives at its antithesis. An attentive reader might find the limiting principle, but the incautious reader will find authority that acts as bulwark for the incumbent in a natural-monopoly market.

. For several years prior to 1991, the County had two full-service, on-airport FBOs—a privately run FBO and the County’s own FBO. Aplt. Opening Br. at 6-7.

. JetAway's expert was instructed to assume that the County was "acting in a proprietary capacity as the operator of the Montrose Airport and as the historical provider of FBO services at the Airport,” but "[o]nce the County decided to privatize the Montrose Airport, the County was obligated to select one or more private FBOs ... through a competitive bidding process to promote public interests.” Aplt.App. at 4842.

. JetAway concedes that the County’s efforts to shutter JetAway’s through-the-fence FBO have no relevance here. Aplt. Opening Br. at 20 n.19 ("The disputes between the County and JetAway concerning its former off-Airport operation, closed now for over 3 lk years, are irrelevant to JetAway's antitrust claims asserted herein.”).

. The Holmes Concurrence also cites Colorado Interstate Gas Co. v. Natural Gas Pipeline *861 Co. of America, 885 F.2d 683 (10th Cir.1989) as authority supporting the position that temporary anticompetitive effects are insufficient to state an antitrust injury. See Holmes Concurrence at 30-32, 57-58 n.21. Like Adaptive Power Solutions and Williamsburg Wax, that case addressed a situation involving a transitory period with reduced competition. Colo. Interstate Gas Co., 885 F.2d at 696-97. Colorado Interstate Gas Co. is also inapplicable because our holding alternatively rested on the fact that “[tjhere was no reasonable chance, let alone a dangerous possibility” that defendants' conduct could actually create a monopoly at all. Id. at 695.

. In response to Judge Holmes’s discussion about the limits of the judiciary to select the superior monopolist in an antitrust case, Holmes Concurrence at 40-48, I note that I reach my conclusion without any judgment on whether JetAway could ultimately provide better FBO services for consumers. Yes, Judge Holmes is right that the specific “identity of a monopolist is of no concern to antitrust law.” Id. at 45. But the identification of a possible upstart to challenge an incumbent’s monopoly in a one-firm market is an entirely different inquiry that does not evaluate which monopolist should (or will) carry the day. The existence of a challenger in a low-demand market can enhance competition and benefit consumers regardless of whether it should (or will) ultimately unseat the controlling monopolist. See III Areeda, ¶ 658b3, at 177-78.

. Indeed, the underlying rationale extends much further. The Holmes Concurrence's position ultimately rests on the futility of permitting competition when one firm is certain to prevail eventually. But if futility is an available argument, then a defendant can win an antitrust case simply by convincing the jury that its product is superior to the plaintiff's and therefore competition will be futile because plaintiff’s business will eventually fail, leaving the market unchanged.