FILED
United States Court of Appeals
Tenth Circuit

February 18, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRISTY SPORTS, LLC, a Colorado
Limited Liability Company,

        Plaintiff-Appellant,

v.

DEER VALLEY RESORT
COMPANY, LTD., a Utah Limited
Partnership,

        Defendant-Appellee.

No. 07-4198

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 06-CV-964-DAK)**

---

Thomas P. McMahon, Jones & Keller, P.C., Denver, Colorado (Steven G. Loosle, Kruse Landa Maycock & Ricks, LLC, Salt Lake City, Utah, with him on the briefs), for Plaintiff-Appellant.

Gordon Strachan, Strachan, Strachan, & Simon, P.C., Park City, Utah (Kevin J. Simon, with him on the brief), for Defendant-Appellee.

---

Before **McCONNELL**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

When the Deer Valley Resort Company ("DVRC") was developing its world-renowned ski resort in the Wasatch Mountains, it sold parcels of land within the resort village to third parties, while reserving the right of approval over the conduct of certain ancillary businesses on the property, including ski rentals. For about fifteen years, DVRC granted permission to Cole Sports and plaintiff-appellant Christy Sports to rent skis in competition with its own ski rental outlet. More recently, however, DVRC revoked that permission, presumably in order to gain more business for its own newly-opened mid-mountain ski rental store. The question is whether this revocation violated the antitrust laws. We conclude that it did not.

## I. Background

Deer Valley is one of three resorts in the vicinity of Park City, Utah. Many—indeed, "the vast majority," according to the Complaint, ¶ 25—of Deer Valley's patrons are destination skiers who fly into Salt Lake City and then take a forty-five minute bus or shuttle ride to the resort. The resort itself is divided into two areas: the base area, located at the bottom of the mountain, and the ritzier mid-mountain village, located halfway up the slope. DVRC has always been the sole provider of ski rentals at the base area, but at the mid-mountain village, Christy and Cole Sports have operated rental facilities; DVRC itself opened a mid-mountain ski rental facility in 2005.

Originally, DVRC owned all the property at the mid-mountain village, but

-2-

over the years it has sold parcels to third parties. In 1990, DVRC sold one such parcel to S.Y. and Betty Kimball, subject to a restrictive covenant that prohibited use of the property for either ski rental or real estate sales office purposes without DVRC's express written consent. The Kimballs built a commercial building and leased space in it to Christy's corporate predecessor, Bulrich Corporation. The lease expressly prohibited both the rental of skis and the operation of a real estate office. The next year, though, DVRC gave Bulrich permission to rent skis in return for 15% of the rental revenue. When Bulrich merged with another company in 1994 and formed Christy Sports, LLC, Christy continued to operate the rental business. According to the complaint, Christy stopped paying DVRC 15% of its rental revenue in 1995, though the reason for this change is unknown. Christy rented skis at the Deer Valley mid-mountain village with no objection from DVRC until 2005. During that time, DVRC was the sole purveyor of rental skis at the base area but did not have a ski rental operation at mid-mountain.

DVRC opened a mid-mountain ski rental outlet in 2005. In August of that year, the resort notified Christy that, beginning the following year's ski season, the restrictive covenant would be enforced and Christy would no longer be allowed to rent skis. Christy believes that DVRC issued the same message to Cole's, leaving DVRC as the only rental ski provider at Deer Valley, with the exception of a small operation at the Stein Eriksen Lodge, which serves its own lodgers. This leaves that majority of skiers who fly into Salt Lake City and then

shuttle to Deer Valley with few choices: they can carry unwieldy ski equipment onto the plane,[1] take a shuttle into Park City and hunt for cheaper ski rentals in town, or rent from the more conveniently located DVRC location. Christy predicts, not improbably, that most consumers will choose the third option.

Christy argues that DVRC's decision to begin enforcing its restrictive covenant is an attempt to monopolize the market of ski rentals available to destination skiers in Deer Valley, or, alternatively, to the destination skiers in the mid-mountain village itself. It alleges that by eliminating its competitors, DVRC will be able to increase prices and reduce output, thus harming consumers. The complaint states that the number of skis available for rental mid-mountain will decline by 620 pairs, and the price will increase by at least twenty-two to thirty-two percent.

The district court dismissed Christy's antitrust complaints. In this appeal, Christy challenges only the dismissal of its claims under § 2 of the Sherman Act.

## II. Analysis

We review the grant of a Rule 12(b)(6) motion to dismiss de novo. *Teigen*

---

[1] We decline Christy's request to take judicial notice of newspaper stories reporting that airlines have made it more difficult and costly for passengers to transport their skis. Whether or not such materials would be admissible in district court, this is an appeal of an order dismissing the complaint at the pleading stage. The question before this court is whether the complaint states a claim upon which relief may be granted. For that purpose, we assume that the factual allegations of the complaint are true, and are not concerned with evidence that the parties might bring supporting or challenging those allegations.

*v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). In doing so, we ask whether there is "plausibility in [the] complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1970 (2007). The complaint "does not need detailed factual allegations," *id.* at 1964, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. When, in *Twombly*, the Supreme Court emphasized the need for plausibility in the complaint rather than "wholly conclusory statement[s]," *id.* at 1966–67, it warned particularly of the high costs and frequent abuses associated with antitrust discovery. *Id.* at 1959 ("It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.") (internal citations omitted). The concept of "plausibility" at the dismissal stage refers not to whether the allegations are likely to be true; the court must assume them to be true. The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Christy has alleged that DVRC violated § 2 of the Sherman Act by either actual or attempted monopolization. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Similarly, an

attempt claim must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power," with the third element requiring "consider[ation] [of] the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Under both types of § 2 claims Christy must therefore plead both power in a relevant market and anticompetitive conduct. The relevant market, according to Christy's complaint, is the market for ski rentals to destination skiers in Deer Valley in general or, even more narrowly, the market for ski rentals in the mid-mountain village. Compl. ¶ 61. The alleged anticompetitive conduct is the enforcement of the restrictive covenant.

A great many pages in the briefs are devoted to whether the defined market set forth in the complaint—destination skiers at Deer Valley, or alternatively at Deer Valley's mid-mountain village—is too small to constitute a market for antitrust purposes, in light of the proximity of a number of ski rental outlets in Park City, just down the road. For purposes of analyzing the complaint, however, we find it not implausible that destination skiers who arrive at the resort by bus or shuttle will find it sufficiently inconvenient to travel into town to rent skis that a successful monopolist over ski rental at Deer Valley could charge supracompetitive prices. The question, we believe, is not whether DVRC might be able to raise prices and reduce output by becoming the only purveyor of rental

-6-

skis at the resort, but whether such a market is legally cognizable under the antitrust laws and whether the decision of a resort owner to reserve to itself the right to provide ancillary services counts as anticompetitive conduct.

The defendant argues that these issues must be analyzed primarily from the temporal perspective of DVRC's decision to impose a restrictive covenant on the sale of the property to the Kimballs. It points out that DVRC had the right not to sell the property at issue at all; it could have operated its own ski rental facilities at mid-mountain as it did at the base, without allowing competitors to enter the business. None of this would have violated the antitrust laws. Such an arrangement would not have diminished competition; on the contrary, by creating a resort and providing all the services ancillary to it, DVRC increased competition in the ski industry as a whole. The defendant argues that the analysis is the same when it allows an outside ski rental provider to operate for a period of time, and later changes its mind. If it is permissible for a resort owner to impose a covenant on land sales restricting potential competition in the provision of ancillary services, defendants argue, it must be permissible to exercise those rights under the covenant at a later date.

The plaintiff argues, on the contrary, that the temporal focus should be on DVRC's decision to withdraw its consent to the operation of Cole and Christy's ski rental facilities. It argues that this decision diminished competition in the ski rental business for destination skiers at Deer Valley (or, alternatively, at mid-

mountain), and will result in lowered output and higher prices for ski rentals, as compared to the situation before DVRC withdrew its consent.

We begin our analysis with DVRC's original decision to impose the restrictive covenant.

## A.    Imposition of the Restrictive Covenant

We agree with the defendant that the creator of a resort has no obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property.  A theme park, for example, does not have to permit third parties to open restaurants, hotels, gift shops, or other facilities within the park; it can reserve to itself the right to conduct such businesses and receive revenues from them.  Accordingly, if it sells land within the resort to third parties, the antitrust laws do not bar the resort owner from imposing a covenant against use of the property for competitive businesses.  This is so even if food, rooms, gifts, or other ancillary goods and services would be cheaper and more plentiful if the resort owner allowed competition in these businesses.

This conclusion can be reached either by reference to the proper definition of a market or by reference to the absence of anticompetitive conduct.  Some courts, faced with cases of this sort, have found the market definition implausible. The Seventh Circuit took this approach in *Elliott v. United Center*, 126 F.3d 1003 (7th Cir. 1997), when a peanut vendor challenged a sports arena's decision to ban outside food and thereby monopolize the market for food concessions within the

arena.  The court rejected that market definition as implausible, saying:

> The logic of [the] argument would mean that exclusive restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be "monopolizing" the sale of wine within its interior.  Movie theaters, which traditionally (and notoriously) earn a substantial portion of their revenue from the sale of candies, popcorn, and soda, would be required by the antitrust laws to allow patrons to bring their own food.

*Id.* at 1005.  Other courts agree.  Hospitals alleged to have monopolized the market for medical services within that single hospital, *Collins v. Associated Pathologist, Ltd.*, 844, F.2d 473, 480 n.5 (7th Cir. 1988); *Ginzburg v. Memorial Healthcare Systems, Inc.*, 993 F.Supp. 998, 1013 (S.D. Tex. 1997), and a cemetery alleged to have monopolized the market for tombstones within that cemetery, *Monument Builders of N.A. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733–37 (6th Cir. 2008), were all declared too narrow to constitute a relevant market.  Perhaps even closer to this case is *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000), in which Yale University was alleged to have monopolized the market for on-campus housing within its sprawling complex of facilities.  The Second Circuit rejected the idea that it is impermissible for an institution to monopolize one particular product within an establishment that provides a variety of interrelated services, the most important one of which is education.  The alleged market was too narrow.

Although discussion of sports arenas and universities seems to suggest that Christy's shortcomings lie with its alleged geographic market, the actual problem

lies with its product market. In these cases the two are difficult to disentangle because the product (rental skis, as here, or housing, as in *Hack*) is intimately related to the location. Consumers do not travel to Deer Valley for rental skis, just as they do not attend Yale to live in an Eero Saarinen-designed dormitory. The true product in these cases is the overall experience. Deer Valley offers a cluster of products that combine to create a destination ski experience; rental skis are only one small component. *Cf. United States v. Phillipsburg Nat. Bank & Trust Co.*, 399 U.S. 350, 361 (1970) ("[T]he cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved."); *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 356 (1963) (defining the relevant market under the Clayton Act merger analysis as "the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term 'commercial banking'"). The complaint alleges nothing to suggest that destination skiers are choosing their ski resort based on the price of rental skis, separate and apart from the cluster of services associated with the destination-ski experience. To define one small component of the overall product as the relevant product market is simply implausible.[2]

_____

[2]We should not be misread as suggesting the implausibility of a rental ski product market within a reasonably well-defined geographic area. We simply hold implausible Christy's attempt to suggest a product market exists in rental

(continued...)

Alternatively, one could say that the monopolization claim would fail because the alleged conduct is not anticompetitive. Even if a firm has monopoly power in a relevant market, a plaintiff must also show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570–71. Deer Valley is not required to invite competitors onto its property to rent skis to its patrons, even if a failure to do so would mean it is the sole supplier of rental skis at the ski area.

The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal, as it recently re-emphasized: "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). In *Trinko*, the Court acknowledged that in rare circumstances a refusal to cooperate with competitors might constitute a § 2 violation, but that "such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm," *id.*, should

_____

[2](...continued)
skis for destination skiers, disaggregated from the full destination ski experience.

-11-

be few.

Having invested time and money in developing a premier ski resort that attracts skiers from across the nation, DVRC could recoup its investment in a number of ways. It could increase the price of lift tickets, raise room rates, serve only high-priced food, or, as it seems to have chosen, delve more deeply into the rental ski market. *See Elliott*, 126 F.3d at 1005 ("[The United Center] can charge very high ticket prices, and allow unlimited numbers of food concessions in and around the stadium, or it can charge somewhat lower ticket prices and restrict the number of concessions (thereby earning some of its profits from the food sales)."). This does not mean consumers have no protection. The ski resort industry is competitive (and Christy does not allege otherwise). Families contemplating ski vacations have many options, and they presumably compare quality and price. If they are rational, the price they are concerned about is the sum of all of their prospective vacation costs, including not just lift ticket prices and resort lodging, but air fare, food and drink, apres-ski entertainment, ski rentals, and the like. A resort that facilitates lower ski rental prices by allowing competition is able to price other aspects of the ski vacation experience more aggressively. The competitive discipline comes not from introducing competition with respect to each component of the experience, but from competition with other ski resorts with respect to the entire package. Christy has not alleged, and it would not likely be plausible to allege, that DVRC's decision

-12-

to foreclose competition in the ski rental business at the mid-mountain village will have any effect on the market for ski resort vacations as a whole.

Indeed, allowing resorts to decide for themselves what blend of vertical integration and third party competition will produce the highest return may well increase competition in the ski resort business as a whole, and thus benefit consumers. This flexibility about business strategies induces entrants into the ski resort business by allowing them to reserve the benefits of their investments to themselves. Disneyland may have made a business miscalculation in locating where third parties could conveniently supply hotels, restaurants, and other services to its guests. *See Elliott*, 126 F.3d at 1005 (citing Jim Molnar, *A Tale of 2 Disneys: Out of a Single Mouse Different Playgrounds Grew*, Seattle Times, May 19, 1991, at L1). The antitrust laws do not make such miscalculations legally obligatory.

The idea that restrictive covenants limiting immediate competition may promote competition in a broader market finds support in this court's decision in *Drury Inn–Colorado Springs v. Olive Co.*, 878 F.2d 340 (10th Cir. 1989), a case on which the district court below heavily relied. In *Drury Inn*, a motel chain purchasing a tract of land insisted that the seller attach a restrictive covenant to a neighboring lot that would prevent a competing motel from operating next door. The court held that the restrictive covenant was not a per se violation of § 1 of the Sherman Act, concluding that the arrangement was one that "merely regulates

-13-

and perhaps thereby promotes competition." *Id.* at 342. To be sure, in an immediate sense the restrictive covenant barred competition against the motel chain, but in a broader sense it facilitated the entry of a new market participant, to the benefit of consumers and competition overall. Without the covenant, Drury Inn might not have entered the market. This case is similar, in that DRVC insisted on attaching a restrictive covenant to its sale of land to the Kimballs to protect its future ability to profitably operate a ski rental business. Because both the land deal and the potential opening of a ski rental business would expand the market, the arrangement "merely regulates and perhaps thereby promotes competition." *Id.*

*Drury Inn* of course has differences from this case. As Christy points out, *Drury Inn* was a § 1 case; the antitrust issue was raised as an affirmative defense to a breach of contract action rather than as a freestanding antitrust claim; the restrictive covenant was more limited in time; and the restriction operated to the benefit of the buyer rather than the seller. But despite these surface differences, the underlying economic logic of *Drury Inn* is equally applicable here: that when a landowner divides his property and sells part to a third party while retaining the rest, attachment of a restrictive covenant to one of the two parcels can promote competition by enabling the owner of the other parcel to start a business without potentially crippling competition on its doorstep. It does not matter, legally or economically, whether the business will be started by the purchaser (as

-14-

in *Drury Inn*), or the original property owner (as in our case). Just as a property owner who operates a business on his land has no obligation to sell part of his property to a person who intends to open a competing facility, he generally has no obligation, if he sells part of the property, to allow a competing facility to be opened there. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985) (Easterbrook, J.) ("Antitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt at every moment.").

Either line of reasoning—whether based on market definition or lack of anticompetitive conduct—leads to the same conclusion. Indeed, they are two sides of the same coin: having created a resort destination, antitrust will not force a resort developer to share its internal profit-making opportunities with competitors. The relevant market requirement reaches this result by finding implausible a market definition that singles out a small component of the cluster of services that constitutes the actual product; the anticompetitive conduct requirement reaches it by saying that it is not anticompetitive to refuse to grant access to competitors.

## B.    Revocation of Consent to Operate a Ski Rental Facility

The plaintiff does not seriously argue that it was impermissible for DVRC to impose the restrictive covenant back in 1990, or that it would have been impermissible for DVRC to use its ownership of the land to bar competition in

-15-

the ski rental business from the beginning.  Rather, the plaintiff argues primarily that, having allowed third parties to engage in the ski rental business for almost fifteen years, DVRC violated § 2 of the Sherman Act when it revoked that permission and took over the ski rental business for itself.

We do not see the logic in this argument.  If antitrust law permits a resort operator to organize its business in either of two ways, by providing ancillary services itself or by allowing third parties to provide the service on a competitive basis, we do not see why an initial decision to adopt one business model would lock the resort into that approach and preclude adoption of the other at a later time.  Conceivably, such a change might lead to a claim under contract law or as a business tort.  We would not even preclude the theoretical possibility that such a change could give rise to an antitrust claim, for example, if by first inviting an investment and then disallowing the use of the investment the resort imposed costs on a competitor that had the effect of injuring competition in a relevant market.  But there are no such allegations here.  Indeed, Christy knew from the beginning that it could operate a ski rental business only by permission of DVRC, on a year-to-year basis.  It cannot claim unfair surprise.

The closest case in support of the plaintiff's position is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  In *Aspen Skiing*, two companies had successfully cooperated to offer skiers joint passes to both companies' mountains, until the larger of those companies decided to end the

relationship. *Id.* at 587–95. Indeed, it not only stopped offering the joint pass, but, when its former partner tried to recreate the multi-mountain pass by giving its customers vouchers equal to a price of a full day's lift ticket, it also refused to honor those vouchers. *Id.* at 593–94. The Court held that termination of the relationship was anticompetitive. The case could be interpreted as holding that even if a firm has the right to refuse to do business with a competitor, it may not necessarily have the right to do so after establishing a business relationship. The Court has since said, however, that "*Aspen Skiing* is at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, and noted that the key fact in *Aspen Skiing* was that the defendant terminated a profitable relationship without any economic justification, showing "a willingness to forsake short-term profits to achieve an anticompetitive end," *id.*, especially when it refused to renew the joint ticket "*even if compensated at retail price.*" *Id.* The critical fact in *Aspen Skiing* was that there were no valid business reasons for the refusal.

Here, in contrast, we have no indication that DVRC is terminating a profitable business relationship. There is no allegation that DVRC was motivated by anything other than a desire to make more money for itself. For all that appears from the complaint, DVRC expects to increase (not forsake) short-term profits by operating its own ski rental facility at the mid-mountain village. The Sherman Act does not force DVRC to assist a competitor in eating away its own customer base, especially when that competitor is offering DVRC nothing in

-17-

return.  Moreover, by using the restrictive covenant DVRC had explicitly informed its competitors from the beginning that the relationship could change at any time.  Unlike the competitor in *Aspen Skiing*, Christy should have been aware that the relationship was temporary and subject to DVRC's business judgment.  DVRC's behavior does not reach the "outer boundary of § 2 liability," *id.*, at which *Aspen Skiing* lies.

At oral argument Christy argued that our opinion in *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999) requires us to view any decrease in competition as an antitrust violation, even when that decrease represents simply a return to a formerly valid level of competition.  In that case, a group of archery manufacturers boycotted a trade show sponsored by a trade show promoter in order to run that promoter out of business and begin promoting shows itself.  *Id.* at 748.  The boycott organizers argued that "[their] alleged activities were not anticompetitive because [they] actually increased the output of exhibition space, albeit briefly, and because the output of exhibition space merely returned to the pre-boycott level after the [competitor] failed."  *Id.* at 755.  We rejected that argument, saying that "the bare fact that the output of exhibition space before and after the alleged boycott stayed the same says nothing about whether the process in between was anticompetitive, which it allegedly was."  *Id.*

*Full Draw* indicates only that we cannot infer the absence of

anticompetitive behavior simply by comparing the level of raw output before and after the alleged violation; we must still consider the underlying behavior. It does *not* suggest that any decrease in the number of competitors or total output will automatically violate the antitrust laws. The defendants in *Full Draw* did not experiment with a new business plan and then return to their earlier status; they actively changed that earlier status by driving a pre-existing competitor out of the market. Rather than inviting a competitor into its market and then rescinding the invitation, the *Full Draw* defendants actively invaded another market through anticompetitive behavior and substantially changed what that market looked like. Whereas DVRC returned to a position it had a right to from the beginning, the *Full Draw* defendants created a position they never had a right to in the first place.

DVRC should not be forever locked into a business decision made in 1990, especially when it took an affirmative step to preserve its future flexibility by bargaining for a restrictive covenant. This is so even if Christy is correct that by enforcing the restrictive covenant DVRC could increase the price and decrease the output of ski rentals at Deer Valley. It had the right to do so from the beginning, and the fact that it chose to do otherwise for some time does not eliminate that right. The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path.

## C. Whether Definition of a Relevant Market Is Required

The plaintiff also argues that, having pled actual anticompetitive effects stemming from DVRC's enforcement of the restrictive covenant, it was not required to plead a relevant market. It reasons that an allegation of actual anticompetitive effects obviates any need to allege a relevant market because such effects are direct evidence that DVRC has monopoly power. This proposition is more commonly associated with § 1 claims, which inquire into whether a defendant acts to restrain trade rather than to monopolize a market. *See F.T.C. v. Ind. Fed. of Dentists*, 476 U.S. 447, 460–61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.") (internal quotations omitted); *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998). A § 1 claim and a § 2 claim are different inquiries, though. The former prohibits "restraints of trade" that are accomplished through concerted action, while the latter prohibits unilateral conduct but only when it rises to the more severe offense of threatening a monopoly. "Because the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct . . . that may be

indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984). *See also Anserphone, Inc. v. Bell Atlantic Corp.*, 955 F.Supp. 418, 428 (W.D. Pa. 1996) (relying on this distinction to reject argument that anticompetitive effects are sufficient to state a claim under § 2).

Nonetheless, at least one circuit has applied the plaintiff's logic to the § 2 context. *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) ("[A]n antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition."). This circuit has neither accepted nor rejected the theory. In two cases, *Tarabishi v. McAlester Regional Hospital*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991), and *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 968 n.24 (10th Cir. 1990), this court discussed the possibility that proof of anticompetitive effects rendered definition of a relevant market unnecessary in a § 2 case, but in both cases found it unnecessary to reach the issue either because the plaintiffs had failed to prove detrimental effects, *Tarabashi*, 951 F.2d at 1569 n.15, or because the plaintiffs had proved power in a relevant market, *Reazin*, 899 F.2d at 968 n.24. We are in a similar position.

Although Christy insists that it has shown anticompetitive effects by its allegations of a decline in quantity and increase in price of rental skis at the mid-

-21-

mountain village, this is just a repackaging of the argument rejected above. A resort operator's ability to reserve to itself the operation of ancillary businesses within the resort is not dependent on the quantity of output being as high or the price being as low as they would be if there were competition from third parties within the resort. It depends, instead, on either the proposition that a market that involves only one component of an interrelated package of services is not a relevant market for purposes of the Sherman Act or that it is not anticompetitive conduct for a resort owner to refuse to invite competitors to supply ancillary services within its resort. The fact (even if it is a fact, as the complaint alleges) that fewer skis will be available for rental and that prices for rental skis will be higher, does not refute either of these legal propositions.

The plaintiff also devotes much of its briefing to the argument that the restrictive covenant is a "naked" rather than "ancillary" restraint, making it per se illegal regardless of market power. This was the principal point at issue in *Drury Inn*, 878 F.2d at 343, where we found a restrictive covenant ancillary rather than naked. Christy acknowledges, however, that the naked/ancillary restraint distinction pertains only to its § 1 claim, the appeal of which Christy decided to withdraw subsequent to briefing. Aplt. R. Br. 14 ("Those concepts apply *only* in the context of Section 1 restraint of trade claims; they do *not* apply to Section 2 monopoly claims."). Thus, now that the § 1 claim is no longer at issue and only § 2 claims remain, we need not address whether the restrictive

-22-

covenant is a "naked restraint."

### III.  Conclusion

Because Christy Sports has failed to plead a plausible claim for either attempted or actual monopolization under § 2 of the Sherman Act, we **AFFIRM** the district court's dismissal for failure to state a claim.