FILED
United States Court of Appeals
Tenth Circuit

September 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FOUR CORNERS NEPHROLOGY
ASSOCIATES, P.C., a New Mexico
professional corporation, and DR.
MARK F. BEVAN,

      Plaintiffs-Appellants,

v.

MERCY MEDICAL CENTER OF
DURANGO, a Colorado not-for-profit
corporation,

      Defendant-Appellee.

No. 08-1231

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 05-CV-2084-JAP-LFG)**

---

Howard Feller of McGuire Woods LLP, Richmond, Virginia (Kristen M. Calleja
of McGuire Woods LLP; and James E. Hartley and Conor F. Farley, of Holland &
Hart, LLP, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellants.

Mark L. Sabey (Peter A. Sabey with him on the brief), of Kutak Rock LLP,
Denver, Colorado, for Defendant-Appellee.

---

Before **HENRY**, Chief Circuit Judge, and **HOLLOWAY** and **GORSUCH**,
Circuit Judges.

---

**GORSUCH**, Circuit Judge.

To provide Durango, Colorado, residents and Southern Ute Indian tribe members with greater access to kidney dialysis and other nephrology services, Mercy Medical Center, a non-profit hospital, together with the tribe, sought to entice Dr. Mark Bevan to join the hospital's active staff. When Dr. Bevan declined, the hospital hired somebody else. To convince that physician and others to settle in Durango, and aware that starting a nephrology practice was likely to prove unprofitable for the foreseeable future, the hospital and tribe agreed to underwrite up to $2.5 million in losses they expected the practice to incur. To protect its investment, Mercy made its new practice the exclusive provider of nephrology services at the hospital.

In response, Dr. Bevan sued. He contended that Mercy's refusal to deal with other nephrologists, including himself, amounted to the monopolization, or attempted monopolization, of the market for physician nephrology services in the Durango area. The district court granted summary judgment to the hospital, and we affirm for two reasons. First, the hospital has no antitrust duty to share its facilities with Dr. Bevan at the expense of its own nephrology practice. Second, in demanding access to Mercy's facilities, Dr. Bevan seeks to share—not to undo—the hospital's putative monopoly. That, of course, is not what the antitrust laws are about: they seek to advance competition, not advantage competitors.

I

A

Viewing the facts in the light most favorable to Dr. Bevan as the summary judgment non-movant, they reveal that Dr. Bevan and his associates at Four Corners Nephrology Associates, P.C., enjoy a thriving practice based in Farmington, New Mexico. For years, patients throughout the Four Corners area (where Colorado, Utah, New Mexico, and Arizona meet) have traveled to Dr. Bevan's office to receive kidney dialysis and other outpatient nephrology services. These include patients from Durango, Colorado, and its nearby Southern Ute Indian reservation, many of whom require dialysis three times per week. Each round-trip drive between Durango and Farmington can take these patients an hour-and-a-half or more.

In part because of the distance to Farmington and the prevalence of kidney disease in the Durango area, most acutely among members of the Southern Ute tribe, the tribe, Mercy hospital, and the Durango Rotary Club all sought for many years to convince Dr. Bevan to provide kidney dialysis and other nephrology services in Durango. Dr. Bevan consistently declined these invitations. While Dr. Bevan held consulting medical privileges at Mercy, and occasionally took inquiries by phone from doctors there, the last time he entered the Durango hospital to treat patients was in 1995.

Unable to lure Dr. Bevan to town, Mercy and the tribe decided to undertake a joint effort to recruit another nephrologist. After extensive interviews, the tribe selected Dr. Mark Saddler, who agreed to come to Durango in 2005—but on a condition. Concerned that patient numbers in Durango would not provide him with the income he previously enjoyed, Dr. Saddler insisted that the hospital employ him on a salaried basis. The hospital agreed. Anticipating that its new nephrology practice would lose money for many years, the hospital also agreed to underwrite losses of up to $500,000 over seven years, while the tribe agreed to backstop certain additional losses, depositing $2 million into a trust fund for that purpose. In addition, Dr. Saddler was permitted to serve as the director of a new, independently owned outpatient dialysis center in Durango.

Under Mercy's preexisting bylaws, the employment of Dr. Saddler as a full-time active nephrologist automatically terminated Dr. Bevan's consulting privileges. The point of consulting staff members, the bylaws make clear, is limited to filling gaps in the expertise of the hospital's active staff: "Consulting Staff consist of providers who offer services required or desired but not otherwise provided by an Active Medical Staff member." Mercy Medical Staff Bylaws, J.A. at 419. While no longer eligible to serve as a consulting staff member, Dr. Bevan was able, consistent with the hospital's bylaws, to remain a member of its courtesy staff, a position that allowed him to consult and write orders with the permission of an attending physician.

Unsatisfied with these developments, Dr. Bevan, along with one of his associates at Four Corners Nephrology, filed an application to become a member of the hospital's active staff, on par with Dr. Saddler and competing with the hospital's nephrology practice. Mercy's bylaws did not forbid the hospital from having two active staff members with the same expertise, but they did present at least one significant hurdle for Dr. Bevan. Unlike members of the consulting staff, members of the hospital's active staff were obliged by the bylaws to reside within 30 minutes of the hospital in order to be available to provide emergency care. To meet this mandate, Dr. Bevan, who continued to live in Farmington, first suggested that he resided in Durango office space. When that gambit failed to persuade hospital authorities, he told Mercy he had leased a residence near Durango, which, on investigation, turned out to be a plot of vacant land.

As these events unfolded, Mercy decided to preempt any future application from Dr. Bevan and his colleagues by designating its nephrology practice—now including Dr. Saddler and a partner—as the sole provider of nephrology services to the hospital. Mercy cited several factors contributing to its decision. First, hospital administrators expressed concern that granting active staff membership to Dr. Bevan and other Four Corners Nephrology doctors would reduce the volume of patients for Dr. Saddler and his partner to the point where they would lose technical proficiency or leave for better jobs. Second, while Mercy and the tribe anticipated that the hospital's new nephrology practice would operate at a loss,

they feared that granting staff privileges to other nephrologists would exacerbate those losses, causing the hospital to draw down the Southern Ute and hospital subsidies more rapidly. Ultimately, the hospital feared that money would run out before its practice could become self-sustaining. Finally, Mercy administrators expressed concern that Dr. Bevan would offer a repeat performance of his actions in Page, Arizona. According to them (though disputed by Dr. Bevan), when a competing group of nephrologists opened a dialysis center in Page, about four hours west of Farmington, Dr. Bevan responded by opening his own dialysis center in Page. The town apparently couldn't support two competing clinics, however, and the competitor clinic soon closed. Shortly after that, Dr. Bevan closed his clinic in Page, leaving the town with no nephrology practice and many of its kidney dialysis patients once again with a four-hour trek to Farmington. In light of its understanding of this episode, the hospital worried that Dr. Bevan's true intentions were to destroy Durango's nephrology practice, rather than to increase the quality and quantity of nephrology services in Durango.

B

In response the hospital's decision, Dr. Bevan filed this lawsuit. While his complaint outlined various causes of action, for purposes of this appeal Dr. Bevan pursues only his claims that Mercy's decision to exclude him and other nephrologists from admitting patients amounted to the unlawful monopolization, or attempted monopolization, of the market for "nephrology physician services"

in the "Durango area," in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Colorado Antitrust Act of 1992, C.R.S. §§ 6-4-101 *et seq.*[1]  He now stands ready, he says, to reside in Durango and practice nephrology there, but cannot do so without some assurance he might be considered for active staff privileges at Mercy.  In due course, Mercy moved for summary judgment.  With respect to the antitrust claims remaining in play before us, Mercy raised many arguments, including that Dr. Bevan's proposed market definition was fatally flawed, that Mercy possessed no monopoly power, that Dr. Bevan suffered no antitrust injury, and that the hospital engaged in no anticompetitive conduct.

Among these various arguments, the district court focused on one, granting summary judgment to the hospital on the basis that it lacked monopoly power or

[1]  The parties agree that federal antitrust law principles control both Dr. Bevan's federal and state antitrust claims.  The Colorado Supreme Court, whose judgment naturally is final on matters of state law, has held that, "[g]iven the substantial similarity in text and purpose present in the federal and state antitrust statutes, . . . federal decisions construing the Sherman and Clayton Acts, although not necessarily controlling on our interpretation of the Colorado law, are nevertheless entitled to careful scrutiny in determining the scope of the state antitrust statute."  *People v. N. Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295-96 (Colo. 1982).  The Colorado General Assembly similarly noted in its passage of the Colorado Antitrust Act that "the courts [should] use as a guide interpretations given by the federal courts to comparable federal antitrust laws." C.R.S. § 6-4-119.  Consistent with these directions, we have in the past applied federal antitrust analysis to Colorado antitrust claims.  *See, e.g.*, *Full Draw Prods. v. Easton Sports, Inc.,* 182 F.3d 745, 757 (10th Cir. 1999).  Absent contrary direction from any state authority, we see no reason to deviate from this practice here and so proceed to analyze Dr. Bevan's federal and state monopolization and attempted monopolization claims collectively and with attention to federal precedents.

the dangerous probability of achieving it. Monopoly power, of course, consists of "the power to control prices or exclude competition" in the relevant product and geographic markets. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (quotation marks omitted). The district court emphasized that approximately 70% of payments for Mercy's nephrology services come from federal or state "government payers" over whom Mercy holds no sway when it comes to setting the prices or terms of its services. *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 2008 WL 622815, at \*11-\*12 (D. Colo. Mar. 4, 2008). Approximately 1.6% of Mercy's nephrology patients are so-called "self payers"—that is, they pay their own bills without intercession from any governmental or commercial health plan. With respect to these patients, the district court assumed, Mercy may have the power to control price and output. Mercy's remaining nephrology patients participate in commercial health plans. The district court held that, while Mercy could suggest higher prices with respect to these patients, there was no evidence it has "any particular ability to force" on these plans higher prices for nephrology services, let alone that the hospital has succeeded in doing so. *Id.* at \*11.

## II

We review the question whether to grant summary judgment *de novo*, and will affirm a district court's decision to do so only if, viewing the facts in the light most favorable to the non-movant, we discern no genuine issue as to any

material fact and conclude that movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Undertaking this analysis, we first examine the rationale the district court offered for its grant of summary judgment to Mercy, before then turning to consider two alternative bases the hospital has proffered for affirmance.

A

Dr. Bevan argues that the district court erred in its monopoly power analysis. While the district court focused on the hospital's lack of control over prices for the government-payer segment of the market, Dr. Bevan emphasizes that at least 1.6% of Mercy's patients "self pay" and so are subject to unilateral price increases by the hospital. As for the approximately 30% of patients whose bills are paid by commercial health plans, Dr. Bevan asserts that Mercy has requested and obtained general rate increases from commercial payers at least six times in the past three years. He also notes that Mercy has the ability to "balance bill" these patients—that is, the hospital can seek from individual patients any difference between the hospital's stated charges and the payments it receives from the patients' health plans. Given these facts, Dr. Bevan submits, a reasonable factfinder could conclude that Mercy holds market power even with respect to patients covered by commercial health plans.

In reply, Mercy stresses that it negotiates reimbursement rates with commercial health plans across a full spectrum of hospital services, and does not negotiate reimbursement rates for nephrology physician services separately from

those for other physician services. The hospital also argues that commercial health plans are too powerful to allow it to single out and raise prices significantly on any particular service, and that there is little or no evidence in the record of it "balance billing" patients covered by such plans. The hospital does not dispute that approximately 1.6% of its patients are self-payers, but submits that it has no history of gouging them either.

The parties' monopoly power arguments raise interesting questions, including the pertinence, if any, of a firm's control over discrete, if limited, market segments, such as self-payers. Indeed, how best to analyze market power over submarkets has recently divided able judges in an analogous, albeit different, context. *See FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008). The briefs before us also artfully address whether and to what degree the existence of often large commercial health plans may preclude a relatively small regional hospital from exercising price control over particular physician services. *Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 28 n.47 (1984), *abrogated by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ("Insurance companies are the principal source of price restraint in the hospital industry; they place some limitations on the ability of hospitals to exploit their market power."). But fortunately, this case doesn't require us to address, let alone resolve, these questions. We may affirm the district court on any basis that finds adequate support in the record, and before us Mercy has pressed at least two

legal arguments that offer straightforward, well-settled, and amply persuasive bases for doing just that.

B

Mercy argues that its refusal to deal with Dr. Bevan does not constitute anticompetitive conduct within the meaning of Section 2 of the Sherman Act or its state law analog. *See, e.g.*, Answer Br. at 41-44. We agree. The Supreme Court has recently emphasized the general rule that a business, even a putative monopolist, has "no antitrust duty to deal with its rivals at all." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S. Ct. 1109, 1115 (2009); *see also id.* at 1118 ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)) (second alteration in original)).

This presumption should hardly surprise. Allowing a business to reap the fruits of its investments "is an important element of the free-market system": it is what "induces risk taking that produces innovation and economic growth." *Id.*; *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1194

(10th Cir. 2009) ("The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal . . . ."). Without some confidence that they can control access to their own property, real or intellectual, how many firms would be deterred from undertaking the risks associated with, say, a significant new endeavor or facility? In *Trinko*, for example, the plaintiff sought access to Verizon's local telephone network in order to sell its own, competing services. Finding that Verizon had no antitrust duty to share its network infrastructure, the Supreme Court explained that forcing firms "to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive . . . to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407-08; *see also id.* at 407 ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place . . . ."). Put another way, it is the investor's potential pay-off that breeds risk-taking investment. To deny the pay-off is to deter the investment.

While Mercy's refusal to share its facilities with Dr. Bevan does not constitute anticompetitive conduct sufficient to sustain a claim for monopolization or attempted monopolization, we acknowledge that the parties disagree about how best exactly to label Dr. Bevan's claim. At oral argument, though not in his briefs, Dr. Bevan described his claim as one for "monopoly leveraging," with the hospital allegedly using its monopoly over inpatient

nephrology services in the "Durango area" to inhibit competition in outpatient

dialysis services in the same geographic area. Whether embracing the monopoly

leveraging label does anything to help Dr. Bevan's cause, though, is questionable.

Before *Trinko*, some courts of appeals held that a monopolist could violate

Section 2 by using monopoly power in one market merely to achieve a

competitive advantage in a second market. But *Trinko* undid that, explaining that

"there [must at least] be a 'dangerous probability of success' in monopolizing a

second market." 540 U.S. at 415 n.4 (quoting *Spectrum Sports, Inc. v.

McQuillan*, 506 U.S. 447, 459 (1993)). *See also* ABA Section of Antitrust Law,

Antitrust Law Developments 305 (6th ed. 2007). *Trinko* further emphasized that,

"[i]n any event, leveraging [like, we might add, any other Section 2 claim]

presupposes anticompetitive conduct," rather than providing an excuse for

establishing such conduct. 540 U.S. at 415 n.4. Where, as here, the only possible

candidate for anticompetitive conduct could be "the refusal-to-deal claim we have

rejected," denominating one's claim as sounding in "monopoly leveraging" won't

do anything to save it. *Id.*[2]

---

[2] It's not entirely clear that Dr. Bevan has even alleged the *existence* of two separate markets, as his purported "monopoly leveraging" claim requires. At times, Dr. Bevan has suggested that there are two product markets here—one for "inpatient nephrology physician services" and another for "outpatient nephrology physician services." *See* Opening Br. at 12. At other times, he has intimated we have just one market before us—one for "nephrology physician services." *See* Second Am. Compl., J.A. at 47. None of this confusion, however, affects our analysis, because our anticompetitive conduct and antitrust injury holdings do not

(continued...)

At the same time, Dr. Bevan has disclaimed any interest in describing his suit as involving an "essential facilities" claim. While the label seems in some ways to capture the essence of his argument—he expressly contends that active staff membership at the hospital is critical for nephrologists to be able to compete in the Durango area—we can hardly blame Dr. Bevan for his disinterest in the label, given the Supreme Court's skepticism about the "essential facilities doctrine." *See Trinko*, 540 U.S. at 410-11 (noting that the Court has "never recognized such a doctrine" and "[t]o the extent respondent's 'essential facilities' argument is distinct from its general § 2 argument, we reject it"); *see also Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1568 n.14 (10th Cir. 1991) (questioning whether "essential facilities doctrine" is applicable to hospital staffing decisions "for public policy reasons") (internal quotation marks omitted).

In the end, picking an "epithet" to fix on Dr. Bevan's argument may be less illuminating than confronting its substance. *Cf.* Phillip Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L.J. 841, 841 (1989) ("[Essential facilities] is less a doctrine than an epithet, indicating some exception to the right to keep one's creations to oneself, but not telling us what

---

[2](...continued)
rely for their validity on the presence of one market versus two. Though the parties avidly dispute the appropriate scope of the relevant geographic market—should it be limited to the "Durango area" or more properly encompass the "Four Corners area"?—deciding that question is likewise inessential to our analysis.

those exceptions are."); IIIB Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 772, at 199 (3d ed. 2008) ("'[E]ssential facility' is just an epithet describing the monopolist's situation: the monopolist possesses something the plaintiff wants. It is not an independent tool of analysis; it is only a label . . . .").  The substance of Dr. Bevan's claim, of course, is that Mercy, after having entered the inpatient nephrology business by hiring Dr. Saddler and investing considerable sums to ensure the success of its practice, engaged in anticompetitive conduct by refusing to share its facilities with a potential rival for inpatient nephrology services.  As Dr. Bevan himself puts it, "Mercy barred [him] from providing nephrology physician services on an inpatient basis in the Durango area by denying him medical staff privileges,"  Opening Br. at 2, and "having inpatient nephrology privileges is essential for a nephrologist to compete successfully [for outpatient dialysis patients]," *id.* at 12.

In this, the substance of Dr. Bevan's claim, our case is analytically parallel to *Trinko* and *Christy Sports*.  In both of those cases, the plaintiff argued that a putative monopolist engaged in anticompetitive conduct by failing to provide a rival access to certain of its facilities.  In both of those cases, the claim was dismissed as a matter of law.  In *Trinko*, the Supreme Court affirmed Verizon's refusal to deal with its rival because "possession of monopoly power [is] unlawful [only where] accompanied by an element of anticompetitive *conduct*," 540 U.S. at 407, and Verizon's decision to deny a rival access to its own facilities in order to

maximize its own "short-term profits" reflected "competitive zeal," not "anticompetitive malice," *id.* at 409. In the Court's view, Verizon's evident interest in pursuing short-term profits tended to belie Section 2 liability, not to suggest it. *Id.* In *Christy Sports*, a ski rental company complained that the Deer Valley resort refused to extend the company's lease at the resort. Holding that Deer Valley's conduct did not offend the antitrust laws, we explained that, "[h]aving invested time and money in developing a premier ski resort . . . , [Deer Valley] could recoup its investment in a number of ways," including "delv[ing] more deeply into the rental ski market" within the resort by declining to accommodate competitor ski rental companies on its property and keeping that opportunity for itself. *Christy Sports*, 555 F.3d at 1194-95.

Much the same might be said here. Having made a substantial investment in developing its own nephrology practice—indeed, having even tried to secure Dr. Bevan's services for that practice—Mercy is entitled to recoup its investment without sharing its facilities with a competitor. And doing so may well help consumers. Prior to the hospital's arrangement with Dr. Saddler, there were no full-time nephrologists in Durango. Now there are two, Dr. Saddler and his partner. As a result, the consumers—the people of Durango and members of the Southern Ute tribe—have greater access to nephrology services: they still may travel to Farmington and Dr. Bevan's practice, but they now also enjoy other, more convenient options. *Cf. Christy Sports*, 555 F.3d at 1192 (noting that Deer

Valley's initial development of the resort "increased competition in the ski industry as a whole"). As Dr. Bevan himself notes in his reply brief, "Mercy's President and Dr. Saddler testified that it was inconvenient, disruptive and a hardship for patients in the Durango area to have to drive 50 miles to Farmington for treatment. That is why the Southern Ute Indian Tribe worked with Mercy on developing inpatient and outpatient dialysis facilities in Durango." Reply Br. at 27 (citations omitted).

At the same time, the record reveals that the hospital correctly anticipated that a nephrology practice in Durango would operate at a loss for many years and would require the hospital and tribe to underwrite those losses. In reaching its decision to deny Dr. Bevan privileges at the hospital, Mercy worried that a contrary course would cause the premature exhaustion of its loss reserves and leave the town without a nephrologist. The record before us thus suggests that to force Mercy to deal with Dr. Bevan well might deter future investments of the sort the hospital and tribe made in this case—and thus to undermine, rather than promote, investment, innovation, and consumer choice, as the Supreme Court feared in *Trinko*. 540 U.S. at 407-08; *cf. Balaklaw v. Lovell*, 14 F.3d 793, 799 n.13 (2d Cir. 1994) (finding a "pro-competitive justification" for an exclusive contract between a doctor and a hospital where the hospital judged that the doctor was most responsive to the hospital's needs).

Having noted the general rule that the antitrust laws don't compel competitors to share, the rationales for that rule, and the applicability of both to the case before us, we must also recognize an exception. As the Supreme Court has explained, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). In *Aspen Skiing*, the leading case delineating when a single firm's unilateral refusal to cooperate with a rival might run afoul of the antitrust laws, the defendant Ski Co., which owned and managed three Aspen ski mountains, joined with Highlands Corp., the owner of a fourth, to offer a joint ski pass. *Id.* at 589-92. This arrangement continued for years. *Id.* Eventually, however, Ski Co. decided to end the arrangement and sell passes for its three areas alone. It even refused to sell lift tickets to Highlands Corp. at the retail rates available to consumers. *See id.* at 593, 610-11. Ultimately, the Supreme Court held that Ski Co.'s conduct could be found to violate Section 2 because Ski Co. had disclaimed "short-run benefits and consumer goodwill in exchange for a perceived long-run [monopoly]" achieved by driving Highlands Corp. from the market. *Id.* at 611.[3]

---

[3] As it happened, after the Supreme Court's decision, Highlands Corp. continued to lose money and eventually merged with Ski Co., though presumably for a higher price than it would have commanded before the Court's intervention, leading some commentators to argue that *Aspen Skiing* "amounted to no more than a sharing of the monopoly between the parties." Glen O. Robinson, On Refusing to Deal with Rivals, 87 Cornell L. Rev. 1177, 1196 n.74 (2002).

More recently, however, first in *Trinko* and then again in *Pacific Bell*, the Court has instructed us that *Aspen Skiing* lies "at or near the outer boundaries of § 2 liability," and that *Aspen Skiing* controls only where the monopolist's "unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 608, 610-11). We are told that courts should impose a duty to deal under Section 2 only "very cautious[ly], . . . because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408. Applying that lesson in *Christy Sports*, we held that "the key fact" permitting liability in *Aspen Skiing* "was that the defendant terminated a profitable relationship without any economic justification" other than an anticompetitive one. *Christy Sports*, 555 F.3d at 1197 (citing *Trinko*, 540 U.S. at 409); *see also* Areeda & Hovenkamp*, supra*, ¶ 772, at 223-28 (explaining *Aspen Skiing*'s limited role post-*Trinko*).

That key fact is not present here. As was true in *Trinko* and *Christy Sports*, in the case before us "[t]here is no allegation that [Mercy] was motivated by anything other than a desire to make more money for itself." *Christy Sports*, 555 F.3d at 1197. In *Aspen Skiing*, the monopolist was willing to jettison a profitable short-term business relationship and deny to a rival the retail prices available to *all* other consumers. By contrast, the evidence here suggests that Mercy refused

- 19 -

to deal with Dr. Bevan to avoid an *unprofitable* relationship, and that the hospital pursued the course it did to protect and maximize its chances of profitability in the short-term. Dr. Bevan himself comes close to admitting as much, accusing Mercy of harboring the "goal" of "mak[ing] its nephrology physician practice profitable," Opening Br. at 16—an accusation that does more to undercut than to underscore Section 2 liability. *See also* Reply Br. at 4 ("Mercy did not want Dr. Bevan to provide nephrology services in the hospital because it might hurt the profitability of Mercy's nephrology practice."). In fact, the record before us reveals that Mercy, a non-profit entity, acted as it did merely to keep its practice from becoming so unprofitable that it would exhaust more rapidly than anticipated the reserves the hospital and tribe had set aside and leave the town and tribe without the benefit of a local nephrologist. *Aspen Skiing* does not require more economic justification than this to avoid Section 2 liability.

C

Equally and independently problematic for Dr. Bevan is the question of antitrust injury. *See, e.g.*, Answer Br. at 40-49. To succeed in a claim for monopolization or its attempt, Dr. Bevan must show not only that he was harmed by Mercy's conduct, but that the injury he suffered involved harm to competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("[A]ntitrust injury . . . should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *Elliott*

*Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) (finding no "antitrust injury because [the defendant's conduct] has no adverse effect on competition or consumers"). After all, it is the "protection of competition or prevention of monopoly[] which is plainly the concern of the Sherman Act," not the vindication of general "notions of fair dealing," which are the subject of many other laws at both the federal and state level. Areeda & Hovenkamp*, supra*, ¶ 770, at 190; *see also SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) ("The Sherman Act ultimately must protect competition, not a competitor . . . .").

The antitrust violation Dr. Bevan alleges is Mercy's refusal to grant him active medical staff privileges, and by way of remedy he asks us, in addition to damages and other things, to order Mercy to grant him those privileges. *See* Second Am. Compl., J.A. at 60. In doing so, he does not ask us to prevent a monopoly or break one apart. Instead, what he seeks is the chance to *share* in Mercy's putative monopoly. The difficulty is that "[w]hen the monopolist is forced to sell [to a competitor], it sets the monopoly price and overall competitiveness is not affected at all; we simply have two firms sharing the monopoly rather than one." Areeda & Hovenkamp*, supra*, ¶ 773, at 239. That is, even if we were to force Mercy to accommodate Dr. Bevan's demand, the hospital could simply impose costs and conditions on Dr. Bevan's activities that would prevent him from undercutting the hospital's own nephrology practice. Dr. Bevan

very well might be better off with such a shared monopoly, but there's no guarantee consumers would be. Whatever injury he may have suffered, then, it is not one the antitrust laws protect because "a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

Dr. Bevan might reply that we could order Mercy not merely to share its facilities with him, but also dictate the terms of such an arrangement in a manner likely to help consumers. The difficulty with this tack is that the Supreme Court has recently and repeatedly reminded us that "[c]ourts are ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" *Pac. Bell Tel. Co.*, 129 S. Ct. at 1121 (quoting *Trinko*, 540 U.S. at 408); *see also Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.) (listing many difficult questions that "show why antitrust courts normally avoid direct price administration, relying [instead] on rules and remedies . . . that are easier to administer"). The federal judiciary is not a price control agency. As Professor Areeda has argued, and the Supreme Court has affirmed, "[n]o court should impose a duty to deal that it cannot . . . adequately and reasonably supervise." *Trinko*, 540 U.S. at 415 (quoting Areeda, Essential Facilities, *supra*, at 853).

This isn't to suggest that it's always and metaphysically impossible to discern judicially administrable terms on which sharing might be mandated. One

might argue, for example, that Ski Co.'s extensive past course of dealing with Highlands Corp., together with Ski Co.'s refusal to sell to a competitor at its own retail prices, provided a sufficient factual foundation on which a federal court could fashion a judicially manageable remedy. *See* Areeda & Hovenkamp*, supra*, ¶ 772, at 223-24 (describing those facts as "very close to dispositive" in *Aspen Skiing*). But, be that as it may, no such comparable foundation is evident here. Dr. Bevan has never served on Mercy's active staff, only on its consulting staff. The hospital's bylaws have previously forbidden consulting staff members from continuing to offer services at the hospital when an active staff member arrives. And there is no record indication that Mercy has ever had competing active staff nephrology practices at the hospital (very much to the contrary). All of this suggests that, at least in this case, we would do well to abide the Supreme Court's admonition that "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of . . . detailed sharing obligations." *Trinko*, 540 U.S. at 415.[4]

\* \* \*

Dr. Bevan's monopolization and attempted monopolization claims fail as a matter of law for at least two independent reasons:  Mercy's failure to share its facilities is evidence of competitive—not anticompetitive—conduct, and whatever

---

[4] Because we affirm the district court's summary judgment for Mercy, we have no need to address Dr. Bevan's separate arguments challenging the propriety of the district court's intra-district transfer of the case from Denver to Durango in the event of a trial.

injury Dr. Bevan may have suffered from his exclusion from the hospital's staff, it is not one that the antitrust laws were designed to remedy.  The district court's judgment is therefore

*Affirmed.*